**GRUMMAN ALLIED INDUSTRIES, INC. and Grumman Corporation, Plaintiff-Appellants,**

v.

**ROHR INDUSTRIES, INC., Defendant-Appellee.**

No. 89, Docket 84–7402.

United States Court of Appeals, Second Circuit.

Argued Oct. 3, 1984.

Decided Oct. 31, 1984.

Francis J. O'Toole, P. David Richardson, Fried, Frank, Harris, Shriver & Kampelman, Washington, D.C., Alexander R. Sussman, Howard B. Levi, New York City (on the brief), Fried, Frank, Harris, Shriver & Jacobson, New York City, for plaintiff-appellants.

Frederick R. Wirtz, J. Anthony Sinclitico, III, Gibson, Dunn & Crutcher, San Diego, Cal., Gregory A. Markel, John A. Redmon, New York City (of counsel), Davis, Markel, Dwyer & Edwards, New York City, for defendant-appellee.

Before KAUFMAN and WINTER, Circuit Judges and WYZANSKI, Senior District Judge.*

IRVING R. KAUFMAN, Circuit Judge:

On January 3, 1978, Grumman Allied Industries (Grumman), a subsidiary of the Grumman Corporation, acquired all the plants, books, records, and other assets of The Flxible Company (Flxible), a subsidiary of the Rohr Corporation. The price paid was $55 million, and among the assets purchased were two hand-built prototypes—Proto I and Proto II—of a new bus known as the Model 870, and the right to use the design for these prototypes. After the sale was consummated, and after Flxible had sold more than 2,600 Model 870 buses, structural defects arose, and these buses were removed from operation. The dispute before us concerns the propriety of granting Rohr's motion for summary judgment and the dismissal of Grumman's complaint alleging Rohr's misrepresentation and failure to disclose material facts relating to the testing of the Model 870. We affirm the lower court's holding because Grumman contractually disclaimed reliance upon the representations at issue and enjoyed absolute access to all relevant information necessary to confirm the validity of those representations. In so concluding, we merely give effect to what we perceive to be a clear manifestation of the parties' intentions concerning the allocation of risks in the purchase of Flxible's business. Furthermore, we believe that our result comports with modern precepts regarding freedom of contract and limited judicial intervention into private contractual relationships.

Because the intricate factual setting of this case is critical to its resolution, we set forth the facts in some detail.

I.

*The Sale of Flxible*

The roots of this dispute can be traced to May of 1976, at which time Rohr experienced serious financial difficulties and considered selling one of its subsidiaries, Flxible. To determine the feasibility of selling a bus manufacturing company, Rohr retained the investment banking firm of White Weld & Co., which prepared and circulated to a number of potential buyers a memorandum describing Flxible. Grumman received a copy of this memorandum, and in mid-1976 expressed an interest in acquiring Flxible.

The following fifteen months (May 1976 to September 1977) saw Grumman affirmatively pursue that interest. Armed with an arsenal of seasoned negotiators, sophisticated engineers, experienced executives and capable attorneys and accountants, Grumman sought to uncover all information relevant to its potential acquisition. To this end, Grumman representatives repeatedly toured the Flxible plants and, while there, were accorded unrestricted access to all personnel and records. During this period, Grumman representatives were shown a promotional film containing representations, some of which related to the testing of the Model 870.[1]

---

* The Honorable Charles E. Wyzanski, Jr., Senior District Judge, District of Massachusetts, sitting by designation.

1. This film was sent to Grumman's Board of Directors in June 1977. Among the statements made in the sound track of the film were the following:

Like all Flxible buses, the 870 has been thoroughly tested. It's been hit ... it's been dropped ... it's been slammed and subjected to exhaustive endurance and fatigue tests on Rohr's private test track at the Riverside International Raceway in California.... During this test, the 870 was driven over a series of torturing obstacles, almost 250 feet of 6-inch deep chockholes, and 75 feet of raised parallel strips spaced 2 inches apart in a signwave pattern.

This rigorous testing of the 870 culminates a 5-year transit vehicle research and development program that involved all of the 870's predecessors, Hi Value, Metro and federally sponsored Transbus.

These vehicles also were tested at Riverside ... the result—the tough and ready 870.

Before the 870 was road-tested, it was subjected to a series of suspension tests carrying the equivalent of a full standee load. These tests simulated thousands of miles of street driving.

On September 29, 1977, and for the following three months, Grumman and Rohr engaged in formal negotiations. In these negotiations, both sides were represented by experienced businessmen, engineers and attorneys. Both parties formulated, reviewed and modified the several draft agreements that were exchanged and discussed during this period. Indeed, Grumman appointed an acquisition team and a negotiating team to review engineering and financial matters and negotiate a contract that would protect Grumman's best interests. Grumman's acquisition team was comprised of fourteen persons, including three lawyers and at least four trained engineers. The "acquisition" personnel traveled to Flxible's facilities, interviewed its employees and reviewed its documents and products. Grumman's negotiating team was led by Robert Loar, a former Chairman of the Board of Grumman; Robert Landon, who was to become President of Grumman Flxible; Robert Somerville, an experienced engineer who was President of Grumman; and Thomas Genovese, General Counsel to Grumman.

Grumman's negotiating team and Rohr's negotiating team held four formal meetings between September 29, 1977 and December 1, 1977. On September 29, 1977, the rear A-frame of the Proto II cracked during endurance testing and all testing was suspended. Although Grumman had learned that the testing of the Model 870 design was not complete as of July 1977, and that a 10,000 mile endurance test was scheduled, neither the negotiating team nor the acquisition team requested the results of the testing.

After the negotiating teams had agreed on the general terms of sale, Genovese, Grumman's counsel, prepared the initial draft of what ultimately was to become the Final Agreement. Thereafter, revisions were made in a series of drafts, the drafts were subjected to extensive and intensive internal review by Grumman, and their content was discussed by Grumman and Rohr representatives at face-to-face meetings convened in various locations throughout the United States. Genovese acknowledged he had read all seven drafts of the contract, some of them more than once; Somerville, who executed the contract on behalf of Grumman, stated he had read "through all of its iterations" before signing the Agreement.

### The Agreement

The fruition of these extensive negotiations and investigations was an 85 page Agreement that was signed on December 15, 1977, executed on December 23, 1977 and closed on January 3, 1978. In this Agreement, the parties set forth the representations they had made to each other and disclaimed representations as to specific matters. In particular, the Agreement provided that (i) Grumman has "made a lengthy, detailed, and independent investigation regarding ... [Rohr's] Model 870 bus design and specifications," [§ 4.3(b)[2]];

---

**2.** Section 4.3(b) provides in pertinent part:
[T]he parties have agreed that except for the warranties and representations set forth in this Agreement and said Exhibits and Schedules, no other statement, warranty, representation or information, verbal or written, shall be legally binding upon any party or shall be the basis for reliance by the other party. Not by way of limitation of the foregoing, Seller specifically disclaims any representation or warranty regarding the marketability of its Model 870 bus or that it will be salable for any specified length of time (Buyer understanding that the position of the U.S. Department of Transportation is that a new group of specifications for its Transbus will be required for all buses let for bid after September 30, 1979, and Buyer further recognizing that, due to the unknown nature of future specifications of the Transbus, the Model 870 may or may not be adaptable to meet Transbus specifications), or regarding the level of profitability of the current model bus or predicting profitability for its Model 870 bus (including Bids therefore already made or Customer Contracts already made) or the current model bus, it being further understood that in the introduction of any new product, and in particular in the case of the utilization of the Model 870 new manufacturing techniques, that predictions of profitability and manufacturing and mass production efficiency are uncertain. Buyer recognizes that work on the Construction in Progress and on the Model 870 Tooling is behind schedule, that Seller's existing prototype Model 870 buses (which are

(ii) "neither the Construction in Progress nor the Model 870 manufacturing techniques have yet been tested by [Rohr], and accordingly no representations and warranties concerning such have been or are hereby made, implied or given" [§ 4.3(b)]; (iii) "except for the warranties and representations set forth in this Agreement ... no other statement, warranty, representation or information, verbal or written, shall be legally binding upon any party or shall be the basis for reliance by the other party" [§ 4.3(b)]; (iv) Rohr shall continue to accord Grumman access to all Flxible facilities and records and "do everything reasonably necessary to enable [Grumman] to make a complete examination of the assets and properties of [Rohr] and the condition thereof" [§ 3.4(b)[3]]; (v) "neither party is relying upon any warranty or representation of the other not fully set forth herein" [§ 6.11[4]]; (vi) Rohr's "sole representation and warranty regarding the know-how" (defined in § 1.1(i) to include "design") was that Rohr "has the right to use such" [§ 4.1(h)[5]]; and (vii) Rohr disclaims "any warranty, guarantee or liability expressed by law or otherwise, specifically including a disclaimer of the implied warranties of title, merchantability and fitness for intended use" [§ 2.1(b)[6]].

> being transferred hereunder) have been manufactured 'by hand' rather than by use of Model 870 Tooling, and that neither the Construction in Progress nor the Model 870 manufacturing techniques have yet been tested by Seller, and accordingly, no representations and warranties concerning such have been or are hereby made, implied or given.
>
> There are no other warranties or representations, oral or written, except as set forth in this Agreement or the Exhibits and Schedules hereto. Buyer is experienced in the bus manufacturing business generally and the regulations and requirements of the Department of Transportation and the Urban Mass Transit Authority ("UMTA"), and with the use of aluminum manufacturing specifically, and has made a lengthy, detailed and independent investigation regarding the Properties, Assets and Business generally regarding Seller's Model 870 bus design and specifications, specifically, including the use not only of Buyer's managerial, manufacturing and quality assurance representatives, but also numerous persons in the accounting, legal and tax professions.

**3.** Section 3.4(b) of the Agreement provides as follows:

> [Seller shall] continue to afford Buyer, its representatives, agents and employees, at all reasonable times and in a manner and under circumstances which will not cause unreasonable interference with the operation of Seller's business, access to, and facilities to use in connection with such access to, all of the Properties, Assets and Business and all of Seller's books, files, records, tax returns, summary written descriptions of Seller's insurance policies, and other corporate books and records relating thereto, for the purpose of audit inspection examination and copying thereof, and will do everything reasonably necessary to enable Buyer to make a complete examination of the assets and properties of Seller and the condition thereof and to obtain

> risk analysis information and other insurance underwriting data necessary to protect the Bus Business after the Closing date.

**4.** Section 6.11 provides as follows:

> This Agreement and the Schedule and Exhibits thereto, together with all documents concurrently executed or effective, constitute the entire understanding between the parties hereto, with respect to their subject matter, and supersede all prior negotiations and agreements. Neither party is relying upon any warranty or representation of the other not fully set forth herein. No party hereto shall be bound by any communications between them on the subject matter hereof unless such are in writing and bear a date contemporaneous with or subsequent to the date hereof and are executed in accordance with the provisions of this Agreement.

**5.** Section 4.1(h) provides in pertinent part:

> As the sole representation and warranty in this Agreement regarding the Know-how [defined in Exhibit A to include, among other things, 'all engineering, technical data ... relating to the Bus Business, including designs'], to the best of Seller's knowledge it has the right to use such, unrestricted by any person whose rights would materially and adversely affect the Properties, Assets and Business.

**6.** Section 2.1(b) provides as follows:

> Buyer accepts the Properties, Assets and Business as is, where is, whether at the Plants, at various job sites, or at vendors' suppliers', subcontractors', or consignees' places of business as of the Closing Date without warranty as to their condition, fitness, sufficiency for intended use, or compliance with applicable laws or regulations, including without limitation the Occupational Safety and Health Act of 1970, as amended ("OSHA"), or similar state and local laws or regulations, except for any matter which as of the Closing Date was

## Post-Acquisition Activities

At the time the sale was closed on January 3, 1978, the endurance testing of the Model 870 remained incomplete, and records accurately disclosing the defects that surfaced during testing were turned over to Grumman. The endurance testing of Proto II was completed under the auspices of Grumman in April of 1978.

Upon completion of the testing, the Chief Engineer of Grumman, Edward Kravitz, apprised Somerville of the A-frame's failure during the endurance runs. Somerville did nothing. Indeed, between April 1978 and November 1980, he authorized the manufacture and sale of the Model 870 without any additional testing. After more than 2,600 Model 870 buses were produced and sold to transit agencies throughout the United States, a widely publicized A-frame [7] failure occurred in New York City in December 1980, necessitating the Model 870's removal from service.

## The District Court Proceedings

On April 19, 1983—more than two years after the New York A-frame failure, Grumman brought suit against Rohr in the United States District Court for the Eastern District of New York, alleging Rohr had misrepresented and failed to disclose material facts relating to the testing of the Model 870's design. In support of these claims, Grumman cited representations made in the soundtrack of the marketing film and in the preliminary prospectus prepared by White Weld & Co., as well as oral statements made by certain Flxible personnel. Grumman's complaint sought $250 million in compensatory damages, and $250 million in punitive damages.

On December 2, 1983, Rohr moved for summary judgment, asserting that Grumman contractually disclaimed reliance on Rohr's alleged misrepresentations, that Grumman enjoyed access to all relevant information relating to the Model 870's testing (vitiating its claim of justifiable reliance) and that Rohr's relationship with Grumman did not trigger a duty to disclose any facts not covered by the express terms of the agreement or already known by or available to Grumman. On April 4, 1984, Judge Mishler granted Rohr's summary judgment motion. The judge concluded that given undisputed facts establishing Grumman's pre-acquisition investigatory activities, Grumman's expertise and sophistication, the accessibility of Rohr's plants, personnel and records, the arm's-length nature of the negotiations, and the plain language of the Agreement, Grumman's reliance on Rohr's alleged misrepresentations was unjustifiable as a matter of law. In addition, Judge Mishler concluded that Rohr owed Grumman no duty of disclosure upon which Grumman could premise a claim of fraud by omission.

## II.

Essential to understanding the propriety of the district court's grant of summary judgment is an appreciation of the limited function of the judiciary in interposing its will into the private contractual realm. Much has been written about the tension between classical and modern norms of contract interpretation.[8] Adherents of the

the subject of Pending Litigation shown at Schedule 11, and Seller also disclaims (except as specifically provided in this agreement) any warranty, guarantee or liability expressed by law or otherwise, specifically including a disclaimer of the implied warranties of title, merchantability and fitness for intended use, and Buyer assumes liability for all compliance by the Properties, Assets and Business with all state, federal and local laws, ordinances, regulations and orders, including but not limited to those related to environment, safety (specifically including OSHA), equal opportunity, labor matters, and land use, and Buyer agrees to hold Seller harmless from any Claims and Fees in connection therewith, whether or not any noncompliance or alleged noncompliance occurred before or after the Closing Date.

7. The A-frame is a component of the rear suspension understructure.

8. *See* Macneil, *Contracts: Adjustment of Long-Term Economic Relations Under Classical, Neoclassical, and Relational Contract Law,* 72 Nw.U. L.Rev. 854 (1978); Farnsworth, *"Meaning" in the Law of Contracts,* 76 Yale L.J. 939, 946–47 (1967).

classical approach, animated by a belief that a contractual agreement manifests the intent of the parties in a completely integrated form, favor the construction of contracts by reference to the explicit textual language. Modern or "neo-classical" interpretation, on the other hand, seems to derive from the premise that a contextual inquiry is a necessary and proper prerequisite to an understanding of the parties' intent. Although this battle has been waged in legal journals and courts for decades, we need not enter the fray. Both schools of thought agree that a contextual inquiry is not necessary to determine the meaning of a term where that term is clear on the face of the contract.[9] By giving effect to explicit contractual terms, a court has a better chance to carry out the intentions of the parties. Particularly where the two sides are sophisticated, their allocation of risk and potential benefit is properly treated as supreme to any conflicting understanding we may have. We believe there exists a point at which clear contractual language must be read to control a dispute.[10] And we deem the language of this Agreement to be suitably unambiguous.

Mindful of these precepts, we turn to Grumman's contention that its misrepresentation claim is not barred despite its specific disclaimers of reliance on Rohr's representations concerning the testing of the Model 870. We believe such an assertion ignores basic contractual principles, as well as the controlling decisional law.

In *Danann Realty Corp. v. Harris,* 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959), the New York Court of Appeals [11] held that where a party specifically disclaims reliance upon a representation in a contract, that party cannot, in a subsequent action for fraud, assert it was fraudulently induced to enter into the contract by the very representation it has disclaimed. In *Danann,* a buyer of a lease to a building claimed he had been fraudulently induced to make the purchase by false oral representations as to the "operating expenses of the building and as to the profits to be derived from the investment." 5 N.Y.2d at 319, 184 N.Y.S.2d at 601, 157 N.E.2d at 598. In their contract, however, the parties agreed as follows:

" 'The Purchaser has examined the premises agreed to be sold and is familiar with the physical condition thereof. The Seller has not made and does not make any representations as to the physical condition, rents, leases, *expenses, operation* or any other matter or thing affecting or related to the aforesaid premises, except as herein specifically set forth, and the Purchaser hereby *expressly acknowledges that no such representations have been made, and the Purchaser further acknowledges that it has inspected the premises and agrees to take the premises "as is".* . . . It is understood and agreed that all understandings and agreements heretofore had between the parties hereto are merged in this contract, which alone fully and completely expresses their agreement, *and that the same is entered into after full investigation, neither party relying upon any statement or representation,* not embodied in this contract, made by the other. The Purchaser has inspected the buildings standing on said premises and is thoroughly acquainted with their condition.' " (Emphasis supplied by Court.)

---

**9.** Although neoclassical partisans would suggest that such an inquiry is necessary even to settle the question whether the terms are clear in the first instance, we do not agree.

**10.** We note that the judiciary's function in interpreting contracts differs markedly from its role in construing statutes. Unlike contracts, statutes are formulated by collective political bodies, not individual parties. Moreover, they are generally crafted broadly to encompass as many variegated factual situations as possible. Consequently, statutory provisions are often detached from the facts of a particular case and provide courts with minimal assistance in resolving the dispute. Judicial explication is not only proper in such circumstances, it is mandated.

**11.** Section 6.5 of the Agreement provides that it "shall be construed and interpreted according to the law of the State of New York."

5 N.Y.2d at 320, 184 N.Y.S.2d at 601, 157 N.E.2d at 598. The seller of the lease moved to dismiss the purchaser's action for fraudulent misrepresentation based on the terms of the Agreement. The Court of Appeals granted the motion and dismissed the buyer's complaint, noting the issue was "whether the plaintiff [buyer] can possibly establish ... reliance upon the misrepresentations." 5 N.Y.2d at 319, 184 N.Y.S.2d at 601, 157 N.E.2d at 598. By reference to the contractual provisions, the Court concluded that:

> [P]laintiff has in the plainest language announced and stipulated that it is not relying on any representations as to the very matter as to which it now claims it was defrauded. Such a specific disclaimer destroys the allegations in plaintiff's complaint that the agreement was executed in reliance upon these contrary oral representations ...."

*Id.* at 320–21, 184 N.Y.S.2d at 602, 157 N.E.2d at 599. Pointedly, the Court announced: "If the plaintiff has made a bad bargain he cannot avoid it in this manner." *Id.* at 323, 184 N.Y.S.2d at 604, 157 N.E.2d at 600. *Danann* therefore stands for the principle that where the parties to an agreement have expressly allocated risks, the judiciary shall not intrude into their contractual relationship.[12] Animated by principles of traditional contract interpretation, the rule of *Danann* has exhibited great resilience in the face of efforts to delimit its expanse. The instant dispute concerns Grumman's multi-faceted attempt to circumvent the *Danann* doctrine. As we will explain, however, its efforts at semantical legerdemain are unavailing.

### A.

Grumman asserts that the relevant disclaimer provisions in the Agreement lack the clarity and specificity necessary to trigger the rule of *Danann.* To support this claim, Grumman cites the following two representations: "the Model 870 had been thoroughly tested for 10,000 miles on an endurance test track at Riverside, California" and "the technological risks associated with the Model 870 were minimal." The latter representation addresses the efficacy of the Model 870's design, and any reliance on the design was explicitly disclaimed in Sections 1.1(i), 2.1(b) and 4.3(b) of the Agreement. Grumman's claim of reliance on the former representation is somewhat more problematic, insofar as reliance on the Model 870's testing was not expressly disclaimed by Grumman in the Agreement. Upon closer examination, however, we believe it is clear that the testing representation could have been material to Grumman only as a means of validating the design of the bus. Indeed, Grumman's President noted that the purpose of "testing is to find out the efficacy of your design in order to have some—a feeling of security that the design will indeed meet the requirements."

For Grumman's argument to be persuasive, then, *Danann* must be read to require the existence of a precise identity between the misrepresentation and the particular disclaimer. Neither *Danann* nor its progeny supports such a reading, however. Indeed, quite the opposite conclusion is gleaned from the case law. The *Danann* rule operates where the substance of the disclaimer provisions tracks the substance of the alleged misrepresentations, notwithstanding semantical discrepancies. That these principles continue to retain their vibrancy was made clear last year in *Galvatron Industries Corp. v. Greenberg*, 96 A.D.2d 881, 466 N.Y.S.2d 35 (2d Dept.1983). There, the court held that *Danann* precludes reliance where a party acknowledged " 'full familiarity with the financial condition ... of the Corporation' and disclaimed 'reliance on any representations

---

**12.** The rule of *Danann* has been cited with approval by both Williston and Corbin. *See* 5 S. Williston, *A Treatise on The Law of Contracts* § 811 at 893 (3d ed. 1961); 6 *Id.* § 873 at 337; 13 *Id.* § 1540 at 62–63 ("where the written agreement stated that no representations not contained in the contract had been made and that the party had conducted his own investigation, he was precluded from alleging and proving the falsity of certain representations included therein"); 3 A. Corbin, *Contracts* § 578 at 404 (2d ed. 1960).

... made by any other party hereto.' " *Id.* A similar conclusion was reached in *Barnes v. Gould,* 83 A.D.2d 900, 442 N.Y.S.2d 150 (2d Dept.1981), *aff'd,* 55 N.Y.2d 943, 449 N.Y.S.2d 192, 434 N.E.2d 261 (1982), where the court found a disclaimer of reliance upon representations as to the "physical condition" of a business premises to be sufficiently specific to bar plaintiff's action for fraud regarding the repair of a boiler. Mindful of the principles enunciated in the cases cited above, we believe, as a matter of law, that the disclaimer provisions in the Agreement relating to design and testing are sufficiently specific and unambiguous to invoke the *Danann* rule.

## B.

In addition, Grumman asserts that *Danann* is inapposite in light of Section 2.3(d) of the Agreement, which reserves Grumman's right to seek rescission of the contract on the basis of a knowing and intentional "false representation by the Seller which was material to the determination of Buyer to consummate the transaction herein." Upon closer examination, Grumman's argument can be bifurcated. Grumman claims that the Agreement's disclaimer language (set forth in Sections 2.1(b), 4.3(b) and 6.11), when viewed in conjunction with Section 2.3(d), becomes ambiguous and lacks the requisite clarity to trigger the *Danann* rule. Furthermore, Grumman argues that Section 2.3(d) removes this case entirely from the ambit of the *Danann* doctrine because Grumman has not disclaimed all reliance on Rohr's representations, but rather has expressly reserved the right to bring an action for fraudulent misrepresentation.

The fallacy of both arguments is revealed by reference to fundamental principals of contract interpretation. Grumman's construction of Section 2.3(d) is expressly at odds with the unambiguous terms of Sections 2.1(b) and 4.3(b), as well as. Section 6.11, which provides that "neither party is relying upon warranties or representations of the other not fully set forth herein." Moreover, Section 2.3(d) re-

fers to false representations within the Agreement. Nowhere in Section 4.1, which defines "Representations of the Seller," can the material representations alleged by Grumman be found. Grumman's interpretation of Section 2.3(d) would nullify not only the effect of the disclaimer provisions, but also vitiate the clear language of Section 6.11. The principle that "contracts must be viewed so that its terms may have effect rather than be destroyed" militates against such a construction. *See Zdanok v. Glidden Co.,* 288 F.2d 99, 104 (2d Cir. 1961), *aff'd,* 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962); *Corhill Corp. v. S.D. Plants, Inc.,* 9 N.Y.2d 595, 598–99, 217 N.Y.S.2d 1, 3, 176 N.E.2d 37, 38 (1961); Restatement (Second) of Contracts, § 203 comment b (1981). In effect, Grumman would have us ignore this most venerable of contract norms. This we are not prepared to do.

## C.

Furthermore, Grumman attempts to carve out a limited exception to the *Danann* rule in instances where the disclaimer provisions were induced by fraud. In framing this argument, Grumman claims that Rohr officials explicitly assured the members of the Grumman negotiating team that the disclaimer language of Section 4.3(b) did not encompass the design and testing of the Model 870. Grumman alleges that its acceptance of this provision was secured only by Rohr's fraudulent assurance. We believe such an argument must fail as a matter of law.

The genesis of the "procured by fraud" exception may be found in the following passage from *Danann:*

"The complaint here contains no allegations that the contract was not read by the purchaser. We can fairly conclude that plaintiff's officers read and understood the contract, and that they were aware of the provision by which they aver that plaintiff did not rely on such extra-contractual representations. It is not alleged that this provision was not understood, or that the provision itself

was procured by fraud. It would be unrealistic to ascribe to plaintiff's officers such incompetence that they did not understand what they read and signed. *Cf. Ernst Iron Works v. Duralith Corp.*, 270 N.Y. 165, 171, 200 N.E. 683, 685 ... [T]he larger implication of the *Ernst* case is that, where a person has read and understood the disclaimer of representation clause, he is bound by it. The court rejected, as a matter of law, the allegation of plaintiffs' 'that they relied upon an oral statement made to them in direct contradiction of this provision of the contract.' "

5 N.Y.2d at 321–22, 184 N.Y.S.2d at 602, 157 N.E.2d at 599. In light of the foregoing, we construe the "procured by fraud" language to refer only to a situation where the party against which the disclaimer is asserted is entirely unaware of the existence of the disclaimer—for example, where the disclaimer is inserted surreptitiously into the final draft of the contract. Nothing in the cases cited by Grumman suggests a contrary reading. *See Cohen v. Tenney Corp.*, 318 F.Supp. 280 (S.D.N.Y. 1970); *Goostree v. P. Lorillard Co.*, 26 Misc.2d 109, 202 N.Y.S.2d 456 (N.Y.Cnty. 1960). Grumman has offered no evidence that it was unaware of the disclaimer's existence. Accordingly, the "procured by fraud" exception is inapplicable as a matter of law, and we are impelled to the conclusion that this case is controlled squarely by *Danann.*

### III.

■ The second pillar of Grumman's argument is that the district court erred in holding that Grumman could not claim reliance on Rohr's representations concerning the testing and design of the Model 870. We believe Grumman's claim of justifiable reliance was properly rejected by the district court in light of undisputed evidence demonstrating that Grumman enjoyed unfettered access to Flxible's plants, personnel and documents; and that it possessed the legal, technical and business expertise necessary to make effective use of that access.

The Supreme Court has stated:

When the means of knowledge are open and at hand, or furnished to the purchaser or his agent, and no effort is made to prevent the party from using them, and especially where the purchaser undertakes examination for himself, he will not be heard to say that he has been deceived to his injury by the misrepresentations of the vendor.

*See Shappirio v. Goldberg*, 192 U.S. 232, 241–42, 24 S.Ct. 259, 261, 48 L.Ed. 419 (1904).[13] The principle that access bars claims of reliance on misrepresentations has been expressly recognized by this Court, *see Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 123 (2d Cir.1984); *Frigitemp Corp. v. Financial Dynamics Fund, Inc.*, 524 F.2d 275, 282 (2d Cir.1975), and New York State courts, *see Most v. Monti*, 91 A.D.2d 606, 456 N.Y.S.2d 427, 428 (2d Dept.1983); *Danann, supra*, 5 N.Y.2d at 322, 184 N.Y.S.2d at 603, 157 N.E.2d at 599; *Marine Midland Bank v. Palm Beach Moorings, Inc.*, 61 A.D.2d 927, 928, 403 N.Y.S.2d 15, 17 (1st Dept.1978).

Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance. In *Palm Beach Moorings*, for example, the court, in granting a motion for summary judgment, rejected a claim of justifiable reliance, noting that to rule otherwise would require a finding that "an experienced businessman, as-

---

13. The New York Court of Appeals reiterated this principle in *Danann:*

[I]f the facts represented are not matters peculiarly within the party's knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced to enter into the transaction by misrepresentation.

5 N.Y.2d at 322, 184 N.Y.S.2d at 603, 157 N.E.2d at 600.

suming a controlling interest in a corporation and incurring heavy financial obligations, did so on the basis of verbal assurances given to him by the seller and a bank official." *See Palm Beach Moorings, supra,* 403 N.Y.S.2d at 17. This the court was not prepared to do, particularly given its finding of undisputed access to the corporate records necessary to confirm or disprove the substance of the verbal assurances. *See also Most v. Monti, supra,* (summary judgment proper where an experienced businessman claimed he justifiably relied on a mere verbal assurance, prompting him to incur a substantial financial obligation).

Grumman—the allegedly defrauded plaintiff—is a Fortune 500 company, renowned world-wide for its engineering expertise. The transaction at issue is a $55 million corporate acquisition. At all stages, Grumman was represented by a sophisticated group of counsel, executives and engineers. Grumman enjoyed unrestricted access to all the facilities, personnel and records of Rohr, and despite its knowledge that the Model 870 was undergoing endurance testing in late 1977, Grumman neither inquired into the results of that testing, nor asked to scrutinize testing reports. In light of the unambiguous case law and the undisputed facts, we agree with Judge Mishler that Grumman did not rely solely upon Rohr's representations as to the design and testing of the Model 870. If it did, such reliance was plainly unjustifiable given its extensive inquiries and investigations.

To preserve its claim of justifiable reliance, Grumman contends that its duty to investigate hinges on whether the information required to confirm or disprove the validity of the design and testing representations was peculiarly within Rohr's knowledge. In support of this assertion, Grumman cites *Mallis v. Bankers Trust Co.,* 615

F.2d 68 (2d Cir.1980), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981) and *Tahini Investments, Ltd. v. Bobrowsky,* 99 A.D.2d 489, 470 N.Y.S.2d 431 (2d Dept.1984). We find these cases, however, to be inapposite. In *Mallis,* a bank that was holding securities as collateral did not inform the purchaser of these securities— even upon direct inquiry—of restrictions on their transfer. *See Mallis, supra,* 615 F.2d at 73. In *Tahini,* the purchaser of a 93-acre horse farm failed to discover—despite an inspection of the farm—ten drums of buried chemicals. 99 A.D.2d at 490, 470 N.Y.S.2d at 432. Unlike the case before us,[14] in *Mallis* and *Tahini,* the allegedly undisclosed information was only known by—and indeed only available to—the defendants, and incapable of discovery by the plaintiff, no matter how diligent its investigation.

Accordingly, Grumman's right to unrestricted access and its failure to inquire preclude, as a matter of law, its claim of reliance on Rohr's alleged misrepresentations.

## IV.

The final prong of Grumman's argument is that the district court erred in holding that Rohr had no duty to disclose to Grumman material facts regarding the testing of the Model 870. We find this argument to be unavailing for all the reasons proffered in Sections II and III of our opinion, because the alleged material omissions are nothing more than affirmative misrepresentations about the testing and design of the Model 870. As such, they are subject to the Agreement's plain disclaimers as well as Grumman's unrestricted access and concomitant duty to investigate.

Moreover, this Court has expressly held that, under New York law, a duty to disclose material facts is triggered: "first,

---

**14.** The district court expressly found that "Grumman's experienced lawyers, engineers and negotiators had full and fair opportunity to investigate [and discover] the matters concern-ing the design of the understructure of the Model 870, the testing methods and the defects revealed through testing."

where the parties enjoy a fiduciary relationship ... and second, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." *Aaron Ferer & Sons, Ltd., supra,* 731 F.2d at 123; *see also Frigitemp Corp. v. Financial Dynamics Fund, supra,* 524 F.2d at 283. We hold that neither condition is present in this action. Grumman's attempt to transmute its ordinary arms-length business relationship with Rohr into a fiduciary relationship is unpersuasive. The fact that Rohr has sold aircraft components to a subsidiary of Grumman in no way alters our conclusion. Grumman has completely failed to offer any evidence indicating that the parties placed sufficient trust and confidence in each other to trigger a duty of disclosure. *See Aaron Ferer & Sons, Ltd., supra,* 731 F.2d at 122 (close debtor-creditor relationship does not establish a fiduciary duty); *Frigitemp Corp., supra,* 524 F.2d at 279. Indeed, throughout the course of this transaction, Grumman's representatives confirmed that they were relying upon the advice and counsel of their own engineers, lawyers, and executives to protect Grumman's best interests—not upon a special relationship with Rohr.

As this Court concluded in *Aaron Ferer & Sons, Ltd., supra,* 731 F.2d at 123, a party's knowledge is not superior where the relevant information "was either a matter of public record, was not pursued by plaintiffs, or was disclosed at least in part ...." In light of the undisputed evidence establishing Grumman's unrestricted access to Flxible's facilities, personnel and records, as well as Grumman's arsenal of legal and technical talent, we find the claim that Rohr possessed superior knowledge (that was not readily available to Grumman) to be without merit.

## V.

It is against this legal backdrop that we turn to the precise issue presented on appeal—the propriety of the district court's grant of summary judgment. On a motion for summary judgment, we are mindful of the maxim "the court cannot try issues of fact; it can only determine whether there are issues to be tried." *Heyman v. Commerce and Industry Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir.1975). Moreover, the court must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought, *see id.* at 1320, with the burden on the moving party to demonstrate the absence of any material issue genuinely in dispute, *see Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Summary judgment is appropriate where the factual predicates of each legal question are undisputed.

The issue whether, under the rule of *Danann,* the specific disclaimers in the Agreement precluded Grumman from asserting it had been defrauded by Rohr is a legal question that can be resolved by reference to settled principles of contract interpretation. *See Tokio Marine & Fire Ins. Co. v. McDonnell Douglas Corp.,* 617 F.2d 936, 940 (2d Cir.1980). Once Rohr set forth facts sufficient, pursuant to Fed.R.Civ.P. 56(c),[15] to make a *prima facie* showing that the rule of *Danann* was applicable, Fed.R.Civ.P. 56(e)[16] required Grum-

15. Rule 56(c) states, in pertinent part:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

16. Rule 56(e) states, in pertinent part:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

man to offer specific facts demonstrating the disclaimers were procured by fraud. We agree with the district court that "[n]o evidence of fraud in the inducement was offered by Grumman."

By proffering evidence demonstrating that Grumman enjoyed access to Flxible's facilities, personnel and documents and proof that Grumman possessed the legal, technical and business expertise necessary to make effective use of that access, Rohr met its Rule 56(c) burden of establishing no genuine issues of material fact. The burden then shifted to Grumman to set forth specific facts raising triable issues. We agree with Judge Mishler that Grumman's conclusory statement that "Rohr controlled the flow of information between [itself] and Grumman," absent any factual support, was insufficient to satisfy this burden.

Our conclusion that the district court properly granted summary judgment is bolstered by Grumman's extensive and intensive discovery, spanning a number of years and yielding tens of thousands of pages of corporate documents. As such, the factual development necessary to the principled resolution of this complex dispute was not terminated prematurely. We are confident that summary judgment was appropriately granted in this case.

Accordingly, the judgment of the district court is affirmed.