**NORTHWESTERN NATIONAL INSURANCE COMPANY OF MILWAUKEE, WISCONSIN, Plaintiff,**

v.

**Michael J. ALBERTS, James R. Alberts, Richard J. Alberts, Cassandra M. Sheehan, Raymond Cosgrove, Penelope A. Boyle, John C. Maucere, Jerry Silva, Michael L. Metheny, H.U.A. Resources, Inc., Alton Jones, Arthur Lawson, John J. Muller, Michael J. O'Connell, Randolph K. Pace, Southern Companies, Inc., Michael J. McCann, William Curran, James M. McCabe, Harold A. Thau, Patrick J. Rooney, Van Allen Capital Corp., and Robert T. Norton, Defendants.**

**No. 88 Civ. 3452 (RWS).**

United States District Court,
S.D. New York.

July 6, 1989.

■■■■■■■■■■

Hart & Hume, New York City, for plaintiff; Benjamin D. Lentz, Kevin J. Flynn, of counsel.

Irwin and Post, New York City, for defendants Cosgrove, Curran, McCabe, Muller, Norton and O'Connell; Stuart Alderoty, of counsel.

## OPINION

SWEET, District Judge.

Defendants Robert T. Norton ("Norton"), James McCabe ("McCabe"), Michael J. O'Connell ("O'Connell"), William Curran ("Curran"), John J. Muller ("Muller"), and Raymond J. Cosgrove ("Cosgrove") (collectively, the "Counterclaim Defendants") move for leave to file a counterclaim against plaintiff Northwestern National Insurance Company ("Northwestern"). For the reasons set forth below, the motion is granted in part and denied in part.

*The Parties*

Northwestern is a Wisconsin corporation with its principal place of business in Milwaukee, Wisconsin.

Norton is a lawyer, Cosgrove is president of a holding company, Curran is president of a mortgage company, McCabe is an industry analyst, and Muller is an executive for Wang Laboratories. All are New Jersey residents. O'Connell, a Kentucky resident, is a judge in the Thirtieth Judicial District of the Commonwealth of Kentucky.

Along with seventeen others, the Counterclaim Defendants were limited partners (the "Limited Partners") in Southern Pipeline Partners ("Partners"), an Oklahoma limited partnership. One of the general partners included Southern Pipeline Development, Inc. ("Development"), a subsidiary of Southern Reserve, Inc. ("Reserve"). Michael J. Alberts ("Alberts"), the first named defendant in this action, controlled both Development and Reserve.

Partners's principal assets included a newly constructed natural gas pipeline located in Oklahoma (the "Pipeline") and a gas gathering agreement (the "Gas Gathering Agreement"), under which the Tennessee Gas Pipeline Company agreed to pay Partners for gas gathered and transported through the Pipeline.

*The Facts*

*The 1984 Transaction*

The Limited Partners invested in Partners partially in cash and partially by promissory notes payable to Partners (the "1984 Notes"). Each Limited Partner's proportionate liability on the 1984 Notes equaled his proportionate ownership interest in Partners. Northwestern issued Partners a financial guarantee bond (the "1984 Bond") guaranteeing all payments due under the 1984 Notes.

In return, the Limited Partners submitted an "Application for Investor Bond" and executed an "Indemnity Agreement" indemnifying Northwestern for any losses resulting from the 1984 Bond (the "1984 Agreement"). The 1984 Agreement included a clause stating: "[The Limited Partners] assign, transfer and convey to [Northwestern] all rights, title, interest and estate in and to all limited partnership units which are the subject of this application, ... the assignment being effective as of the date hereof, unless there is no abandonment of, breach of, delay or default in the performance of the obligations contracted in or covered in such bond or of this agreement...."

In 1984, Equilease Corporation ("Equilease") loaned Partners $6,845,000 (the "1984 Loan"), the amount of cash required to construct the Pipeline. Partners assigned the 1984 Notes and the 1984 Bond to Equilease to guarantee the 1984 Loan.

Equilease received principal and interest payments on the 1984 Loan totaling $924,075, which reduced the principal outstanding on the Loan to $5,920,000. Pursuant to the 1984 Bond, Northwestern paid $462,755.74 of the payments made on the Loan.

*The 1987 Restructuring*

Allegedly at Northwestern's request, Alan Esrine ("Esrine") reviewed the transaction consisting of the 1984 Loan, Notes, and Bond and proposed a restructuring that closed on February 12, 1987 (the "1987 Restructuring"). At the closing, the following allegedly occurred:

1) Reserve borrowed $6,845,000 from the Merchants Bank (the "New Loan") and delivered a promissory note (the "1987 Note") to the Merchants Bank. The 1987 Note obligated Reserve to pay the Merchants Bank principal in three equal installments payable on the last day of December 1987, 1988, and 1989, respectively, and quarterly interest payments during each of those years.

2) Northwestern issued a new financial guarantee bond (the "1987 Bond"). The 1987 Bond stated that Northwestern's principals were the Limited Partners, that "each Principal has executed and delivered to [the Merchants Bank] an Assumption Agreement," and that the Limited Partners have requested Northwestern to "obligate itself as Surety with respect to the payment of the Assumption Agreements." The 1987 Bond also provided as a condition that "if [Reserve] makes all the payments of the principal and interest ..., or in the alternative, the Principals make payments as requested by the Obligee under their Assumption Agreements, then this obligation shall be null and void; otherwise, it shall remain in full force and effect."

3) Reserve granted and delivered to Northwestern a first mortgage, security interest and/or lien in the Pipeline and the Gas Gathering Agreement as security for the 1987 Bond.

4) Certain of the Limited Partners executed releases in favor of Northwestern releasing Northwestern from all claims the Limited Partners may have concerning the 1984 Bond.

5) Equilease returned the 1984 Notes to the Limited partners as paid.

6) Northwestern presented an Indemnity Agreement to Reserve for signature, pursuant to which Reserve would agree to indemnify Northwestern for all losses Northwestern might thereafter sustain concerning the 1987 Bond. The Indemnity Agreement further provided that the proceeds of the $6,845,000 Merchants Bank loan would be used to (a) pay Equilease the approximate $4,175,000 balance of the monies due on the 1984 Notes, less a certain discount granted by Equilease; (b) reimburse Northwestern approximately $2,085,688 for its payments made to Equilease under the 1984 bond; (c) establish a fund of approximately $700,000 to be used to acquire new easements and improve the Pipeline so that the Pipeline could generate sufficient revenues to amortize both the New Loan and the Reserve Notes held by the Limited Partners; and (d) pay closing costs and fees in the approximate sum of $225,000.

Also on February 12, 1987, certain of the Limited Partners executed an Agreement with Surety (the "1987 Agreement") obligating the Limited Partners to indemnify Northwestern under the 1987 Bond.

The Counterclaim Defendants contend that Northwestern represented to the Limited Partners that the 1987 Loan would reimburse Northwestern for its payments to Equilease, pay the remaining balance of the 1984 Notes Equilease held, and provide funds to improve the Pipeline. The 1987 Loan was to cover most of these costs, leaving a manageable deficit. However, Northwestern allegedly failed to tell the Limited Partners the 1987 Loan also would be used to provide Northwestern a $135,000 bond premium and to pay $225,000 in closing costs. These additional costs generated a deficit estimated at $415,000.

The Counterclaim Defendants further contend that Northwestern knew that the 1987 Restructuring's collapse would cause Reserve to fail, thereby allowing Northwestern to seize the Pipeline and the Gas Gathering Agreement, which it valued at more than $6,845,000. This benefitted Northwestern, the Counterclaim Defen-

dants contend, because its 1984 Bond was unsecured.

The Counterclaim Defendants also assert that Northwestern presented the 1987 Restructuring to Partners and the Limited Partners as a means to make Partners a successful financial venture.

According to the Counterclaim Defendants, Northwestern told the Limited Partners that the Pipeline and the Gas Gathering Agreement would serve as primary security for their obligation and that they would be liable to Northwestern under the 1987 Agreement only if those assets were insufficient to cover Northwestern's payments under the 1987 Bond. The Counterclaim Defendants also contend that Northwestern represented that the Limited Partners' liability under the 1987 Agreement would be proportionate to their ownership interests in Reserve.

### The Aborted Public Offering

After the 1987 Restructuring closed, Reserve realized that it was in serious financial difficulty. It therefore proposed to Northwestern a restructuring that involved the following: 1) Reserve would transfer the Pipeline and other assets to Development; 2) Development would make a public offering of new securities for $8,000,000 (the "Public Offering"); and 3) Development would assume Reserve's obligations to Merchants Bank and Northwestern. Before proposing this plan to Northwestern, Reserve obtained a firm commitment from Beuret and Company ("Beuret") to underwrite the Public Offering.

The Counterclaim Defendants allege that Northwestern prevented the Public Offering from occurring by unnecessarily delaying its consent to the Public Offering. Northwestern achieved this delay, they contend, by requiring Reserve to account for the proceeds of the 1987 Loan, even though it knew independently how Reserve had applied those proceeds. According to the Counterclaim Defendants, Reserve complied with this request, but Northwestern requested additional accountings. Finally, Northwestern allegedly told Reserve on May 29, 1987 that it would not consent to the Public Offering.

Before it rejected the Public Offering proposal, the Counterclaim Defendants assert, Northwestern had begun considering how it would apply the Pipeline, including a proposal by Esrine that Northwestern arrange its own public offering in connection with the Pipeline.

Hoping to obtain Northwestern's consent to the Public Offering, Reserve sought a seventy-five day extension of the interest payment to Merchants Bank due on September 30, 1987. Merchants Bank agreed, but Northwestern refused. The Counterclaim Defendants contend that Northwestern refused because it wanted to obtain the Pipeline and the Gas Gathering Agreement.

### Reserve's Default and Northwestern's Collection Efforts

Reserve missed the September 30, 1987 interest payment, and on November 15, 1987 Northwestern made the payment pursuant to its 1987 Bond. When Reserve missed the December 31, 1987 principal and interest payment, Northwest made that payment as well.

On April 6, 1988, Northwestern sued to enforce its lien on the Pipeline in the United States District Court for the Eastern District of Oklahoma (the "Foreclosure Proceeding").

On May 20, 1988, Reserve, Development, and Alberts filed for Chapter 11 protection in the United States Bankruptcy Court for the Eastern District of Oklahoma (the "Bankruptcy Proceeding"). The Bankruptcy Proceeding stayed the Foreclosure Proceeding, and Northwestern moved the bankruptcy court to convert Reserve's filing to a Chapter 7 proceeding. The bankruptcy court denied Northwestern's motion, and in the Fall of 1988 transferred the Bankruptcy Proceeding to the United States Bankruptcy Court for the District of New Jersey.

### Prior Proceedings

On May 17, 1988, Northwestern sued twenty-three defendants, including the Counterclaim Defendants, seeking indemnity and declaratory relief. The Counterclaim Defendants answered on August 30, 1988.

*Discovery*

Northwestern has served interrogatories, document demands, and requests for admission on the Counterclaim Defendants and others. The Counterclaim Defendants have responded to the interrogatories and have made documents available to Northwestern for copying and inspection. The Counterclaim Defendants have served Northwestern with interrogatories and document requests and have spent three days reviewing documents at Northwestern's counsel's office. Depositions are proceeding.

*The Counterclaim*

In this motion, the Counterclaim Defendants seek leave to file a counterclaim, alleging fraud (Counts I and II), breach of a duty to disclose (Count III), tortious interference with economic and business relationships (Count IV), breach of a duty of good faith and fair dealing that amounted to a constructive fraud (Count V), and failure to liquidate the Pipeline and the Gas Gathering Agreement before asserting claims against the Limited Partners (Count IV). The Counterclaim Defendants allege that they were unaware of their counterclaim against Northwestern until Northwestern provided them documents during discovery, many of which the Counterclaim Defendants received only in February 1989.

*Standards for Granting Leave to File a Counterclaim*

Rule 13(f), Fed.R.Civ.P., provides: "When a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice so requires, the pleader may by leave of court set up the counterclaim by amendment." Courts should construe Rule 13(f), Fed.R. Civ.P., together with Rule 15(a), Fed.R. Civ.P. *See Banco Para El Comercio Exterior De Cuba v. First Nat'l City Bank*, 744 F.2d 237, 243 (2d Cir.1984). Rule 15(a) permits a party to amend its pleading by leave of court, noting that "leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a).

■ In assessing whether to grant a defendant leave to amend its answer to add a counterclaim, a court should consider whether the counterclaim is compulsory, whether the pleader has acted in good faith and has not unduly delayed filing the counterclaim, whether undue prejudice would result to the plaintiff, or whether the counterclaim raises meritorious claims. *See Index Fund, Inc. v. Hagopian*, 91 F.R.D. 599, 606 (S.D.N.Y.1981).

■ When considering the counterclaim's merit, the court should apply standards applicable under Rule 12(b)(6), Fed.R. Civ.P. Accordingly, construing the counterclaim's allegations in the light most favorable to the defendants and accepting those allegations as true, *see Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), leave to add the counterclaim should be denied only if it appears beyond doubt that the defendants can prove no set of facts supporting their claim that entitles them to relief. *See Dahlberg v. Becker*, 748 F.2d 85, 88 (2d Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1845, 85 L.Ed.2d 144 (1985).

*The Fraud Causes of Action*

In the first and second causes of action, the Counterclaim Defendants claim fraud based upon the following alleged misrepresentations and omissions:

1) Northwestern told the Counterclaim Defendants the 1987 Restructuring was designed to make Partners a successful financial venture.
2) Northwestern told the Counterclaim Defendants the 1987 Loan would be used to pay Northwestern's payments under the 1984 Bond, to cover the remainder owed to Equilease under the 1984 Loan, and to improve the Pipeline.
3) Northwestern failed to tell the Counterclaim Defendants the 1987 Loan also would be used to pay a bond premium to Northwestern and closing costs associated with the 1987 transaction.
4) Northwestern told the Counterclaim Defendants they would be liable under the 1987 Agreement only if the primary security—including the Pipeline and the Gas Gathering Agreement—

was insufficient to cover Northwestern's payments under the 1987 Bond.

■ Northwestern contends that these fraud claims lack merit. First, citing *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959), and *Grumman Allied Industries, Inc. v. Rohr Industries, Inc.*, 748 F.2d 729 (2d Cir.1984), Northwestern argues that the 1987 Agreement contained clauses that bar the Counterclaim Defendants from claiming reliance on the alleged misrepresentations and omissions described above. The 1987 Agreement—which each Counterclaim Defendant allegedly signed—provided that "neither Northwestern nor any of its employees or agents have made any representations or recommendations to me" regarding the 1987 Restructuring, "nor has Northwestern offered or provided any information or advice with respect to the advantages or disadvantages" of the 1987 Restructuring.

According to the Second Circuit, *Danann* "held that where a party *specifically* disclaims reliance upon a representation in a contract, that party cannot, in a subsequent action for fraud, assert it was fraudulently induced to enter into the contract by the *very representation* it has disclaimed." *Grumman*, 748 F.2d at 734 (emphasis added). However, as the *Danann* court itself recognized, this principle does not apply to "a general and vague merger clause." *Danann*, 184 N.Y.S.2d at 601, 157 N.E.2d at 599. The disclaimer clauses Northwestern invokes here—regarding "any representations or recommendations" or "any information or advice"—are far too general to deny the Counterclaim Defendants' allegations of reliance.

Second, citing *Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985), Northwestern contends that the 1987 Agreement's provision making the Counterclaim Defendants' liability to Northwestern "immediate, absolute and unconditional" forecloses the Counterclaim Defendants from alleging fraud here. In full, that provision provided:

I expressly waive any defense, set-off or counterclaim of any kind and whenever acquired, against Northwestern or to the claim(s) asserted by Northwestern therein ... and ... I expressly waive the right to assert therein any defense, set-off or counterclaim of any kind, and whenever acquired, against [the principal debtor] Southern Reserve, the Bank, or any other person, firm or corporation, it being my express intention that in any action or proceeding instituted by Northwestern against me, the basis of which is that Northwestern has made payment ... to the Bank ... because of my failure to make payment due thereunder, my liability to Northwestern therefore shall be immediate, absolute and unconditional.

*Citibank* held that the defendants could not claim reliance upon alleged oral misrepresentations when the defendants were sophisticated business people who executed a multimillion dollar personal guarantee that was "absolute and unconditional," "irrespective of (i) any lack of validity ... of the ... Restated Loan Agreement ... or any other agreement or instrument relating thereto: or "(vii) any other circumstance which might otherwise constitute a defense" to the guarantee. *Citibank*, 495 N.Y.S.2d at 312, 485 N.E.2d at 977.

Like *Danann*, *Citibank* has been interpreted to apply only to specific disclaimers. Thus, in *Goodridge v. Fernandez*, 121 A.D.2d 942, 505 N.Y.S.2d 144, 147 (1st Dep't 1986), the court refused to enforce a provision stating:

This Guarantee shall be construed as a continuing, absolute and unconditional guarantee of payment without regard to (i) the validity, regularity or enforceability of the [principal's obligations], ... (iv) any defense, setoff or counterclaim which may at any time be available to or asserted by [the debtor] against [the creditors], or (v) any other circumstance whatsoever (with or without notice to or knowledge of [the debtor] or the Guarantor) which constitutes, or might be construed to constitute, in bankruptcy or in any other instance, an equitable or legal discharge of [the debtor] for the Obligations or of the Guarantor under this Guarantee.

*See also Schneider v. OG & C Corp.*, 684 F.Supp. 1269, 1273 (S.D.N.Y.1988).

The disclaimer Northwestern invokes here is more akin to the *Fernandez* clause than the *Citibank* clause, and it therefore fails to bar the Counterclaim Defendants' fraud claim.

■ Northwestern also contends that the Counterclaim defendants have failed to plead fraud with particularity as required by Rule 9(b), Fed.R.Civ.P., and that they will be unable to establish the essential elements of a fraud cause of action. However, the counterclaim is sufficiently particular to meet Rule 9(b)'s requirements. Moreover, assuming the truth of the facts alleged—as is required in a motion to add a counterclaim—the Counterclaim Defendants have stated a cause of action for fraud. Whether they will prevail on summary judgment is another matter. Accordingly, leave is granted to assert counts I and II of the Counterclaim.

### Breach of Duty to Disclose

■ The third cause of action charges that Northwestern breached its duty to disclose facts relevant to a business transaction. The Counterclaim Defendants allege that Northwestern possessed superior knowledge regarding the application of the proceeds of the 1987 Loan and the expected deficit, that this information was not readily available to the counterclaim defendants, and that Northwestern knew the Counterclaim Defendants were acting with a mistaken belief regarding those facts. These allegations are sufficient to state a cause of action for breach of a common law duty to disclose. *See Grumman Allied Indus. v. Rohr Indus., Inc.*, 748 F.2d 729, 738–39 (2d Cir.1984); *Beneficial Commercial Corp. v. Murray Glick Datsun, Inc.*, 601 F.Supp. 770 (S.D.N.Y.1985).

Northwestern disputes the factual basis underlying these allegations, but that inquiry is inappropriate on a motion to add a counterclaim. Accordingly, the Counterclaim Defendants' motion to add count III is granted.

### Tortious Interference With Economic and Business Relationships

■ The fourth cause of action alleges that Northwestern interfered with Reserve's and Beuret's underwriting relationship by refusing to consent to the public offering without justification and with the intent to further its own fraudulent ends, namely to obtain possession of the Pipeline and the Gas Gathering Agreement. *See PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 269 (2d Cir.1987) (citing *Martin Ice Cream Co. v. Chipwich, Inc.*, 554 F.Supp. 933, 945 (S.D.N.Y.1983)).

*PPX Enterprises* described this cause of action as follows:

In order to prevail on a claim of tortious interference with prospective economic advantage, a plaintiff is required to show "the defendant's interference with the business relations existing between the plaintiff and a third party, *either* with the sole purpose of harming the plaintiff *or* by means that are 'dishonest, unfair or in any way improper.'" [*Martin*, 554 F.Supp. at 945 (quoting *Robbins v. Ogden Corp.*, 490 F.Supp. 801, 811 (S.D.N.Y.1980))]. If the defendant's interference is intended, at least in part, to advance its own competing interests, the claim will fail unless the means employed include criminal or fraudulent conduct. *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 838 (2d Cir.1980); *Strapex Corp. v. Metaverpa N.V.*, 607 F.Supp. 1047, 1050 (S.D.N.Y. 1985).

818 F.2d at 269 (emphasis in original).

Northwestern contends that the Counterclaim defendants lack standing to assert this claim because the alleged economic relationship involved Reserve, not to its shareholders, including the Counterclaim Defendants. *See Niles v. New York Cent. and Hudson River R.R. Co.*, 176 N.Y. 119, 68 N.E. 142 (1903) (finding no standing where "shareholders suffered solely through depreciation in the value of their stock"). The Counterclaim Defendants respond by arguing that they claim injury as creditors of Reserve, not just shareholders.

*PPX Enterprises* requires interference with "business relations existing between *the plaintiff* and a third party." 818 F.2d at 269 (emphasis added). Here, the business relations were between Reserve and Beuret. The Counterclaim Defendants' status as Reserve's creditors does not make them a party to that business relationship. Accordingly, leave to assert count IV is denied.

### Breach of a Duty of Good Faith and Fair Dealing

■ The Counterclaim Defendants charge Northwestern with constructive fraud, based upon Northwestern's alleged breach of its duty of good faith and fair dealing. New York courts have described a cause of action for constructive fraud as follows:

> In order to recover damages for constructive fraud, the following elements must be established: that (1) a representation was made, (2) the representation dealt with a material fact, (3) the representation was false, (4) the representation was made with the intent to make the other party rely upon it, (5) the other party did, in fact, rely on the representation without knowledge of its falsity, (6) injury resulted and (7) the parties are in a fiduciary or confidential relationship (*see, Brown v. Lockwood*, 76 A.D.2d 721, 730, 432 N.Y.S.2d 186). However, unlike actual fraud, in order to recover damages for constructive fraud, the plaintiff need not prove actual knowledge of the falsity of the representation by the defendant (*see, Brown v. Lockwood, supra*, at p. 731, 432 N.Y.S.2d 186; *Pitcher v. Sutton*, 238 App.Div. 291, 264 N.Y.S. 488 [1933], *aff'd*. 264 N.Y. 638, 191 N.E. 603 [1934]).

*Del Vecchio v. Nassau County*, 118 A.D.2d 615, 499 N.Y.S.2d 765, 768 (2d Dep't 1986). *Brown v. Lockwood* described an additional factor:

> Charges of constructive fraud based upon promises of future performance have also been sustained in purely business transactions where the defendant promisor has, or should have, superior and accurate knowledge concerning the matters to which his statements re-

late.... [I]n purely business transactions the defendant against whom constructive fraud is alleged must have misled the plaintiff by false representations concerning the subject of his superior knowledge or expertise.

76 A.D.2d 721, 432 N.Y.S.2d 186, 195 (2d Dep't 1980).

As discussed above, the Counterclaim Defendants have pleaded a common law fraud claim. Because the Counterclaim Defendants also allege that Northwestern possessed superior knowledge regarding the New Loan's sufficiency to fund adequately the 1987 Restructuring, leave to assert Count V is granted.

### Failure to Liquidate the Pipeline and the Gas Gathering Agreement

■ Finally, the Counterclaim Defendants seek a declaration that Northwestern first must satisfy its claim from the proceeds of the Pipeline and Gas Gathering Agreement before proceeding against the Counterclaim Defendants. They base this contention upon their allegation that Northwestern represented that the Counterclaim Defendants would be liable under the 1987 Agreement only if the Pipeline and the Gas Gathering Agreement proved insufficient to cover Northwestern's payments under the 1987 Bond.

Northwestern contends that this allegation conflicts with the applicable documents and law. However, the Counterclaim Defendants' allegations must be accepted as true for purposes of this motion. Northwestern must assert its factual arguments in a summary judgment motion. Accordingly, leave to add count VI is granted.

### Conclusion

For the reasons set forth above, the Counterclaim Defendants' motion for leave to assert a counterclaim is granted in part and denied in part.

It is so ordered.