**IOP CAST IRON HOLDINGS, LLC, Plaintiff,**

v.

**J.H. WHITNEY CAPITAL PARTNERS, LLC, JHW Acast, LLC, and Aarrowcast Holdings, LLC, Defendants.**

**No. 14 Civ. 816(NRB).**

United States District Court, S.D. New York.

Signed March 3, 2015.

**460**

Adam Gregory Pence, Robert Allen Scher, Foley & Lardner, LLP, New York, NY, James D. Dasso, Rebecca S. Bradley, Foley & Lardner LLP, Chicago, IL, for Plaintiff.

Brett D. Dockwell, Donald Howard Chase, Morrison Cohen Singer & Weinstein, LLP, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.

Plaintiff IOP Cast Iron Holdings, LLC ("IOP"), purchased stock in Aarrowcast Holdings, Inc. ("Aarrowcast"), from defendant Aarrowcast Holdings, LLC ("Holdings"), in 2012. According to IOP, both Aarrowcast and Holdings failed to reveal pessimistic sales projections and information about the desire of Aarrowcast's most important customer to reduce orders. Instead, Aarrowcast (and Holdings, according to IOP) made formal representations and warranties that were consistent with continued growth and stable customer relationships. In 2013, Aarrowcast suffered a severe loss of sales, consistent with information that Aarrowcast and Holdings allegedly failed to divulge.

IOP brings claims under New York law[1] and federal securities law against all three defendants. The common law claims are for indemnification of breaches of warranties (against Holdings alone) and for fraud (against all three defendants). The securities law claims arise under two alternative theories. First, that Holdings is liable as a primary violator of SEC Rule 10b–5,[2] and that the other two defendants[3] are liable under section 20 of the 1934 Act[4] as control persons of Holdings. Second, that Aarrowcast itself was a primary violator, and that all three defendants are liable as control persons of Aarrowcast.[5]

---

1. The parties agree that New York law applies to IOP's state-law claims, despite the lack of any connection between the Aarrowcast transaction and New York. Cf. Stock Purchase Agreement, Compl., Ex. C, C–1 ("SPA") at § 12.7 (providing for application of New York law); N.Y. Gen. Oblig. Law § 5–1401(1) (recognizing contracting parties' choice of New York law to govern certain major transactions).

2. SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, *enacted pursuant to* Securities Exchange Act of 1934 ("Exchange Act") § 10(b) (codified at 15 U.S.C. § 78j(b) (2012)).

3. J.H. Whitney Capital Partners LLC ("Whitney") and JHW Acast LLC ("Acast").

4. Exchange Act § 20(a) (codified at 15 U.S.C. § 78t(a)).

5. As Aarrowcast is now a subsidiary of IOP, IOP has not sued Aarrowcast on this second theory. There is not, however, any requirement that a plaintiff sue a primary violator in order to sue a control person.

Before us is defendants' motion to dismiss all claims. For the reasons stated below, we grant this motion with respect to some causes of action and factual allegations, but deny this motion with respect to others.

## BACKGROUND [6]

### I. THE PARTIES

Aarrowcast (through its subsidiaries) creates complex molds and castings of machine parts. Compl. ¶ 12. Its customers use Aarrowcast's products to manufacture equipment and parts for the agricultural, trucking, military, mining, and construction markets. *Id.* Aarrowcast's largest customer, for example, is CNH America, LLC ("CNH"), a manufacturer of tractors, backhoes, and other heavy equipment. Compl. ¶ 14.

From 2010 to 2012, defendants owned a large majority (approximately 84%) of Aarrowcast stock, with the remaining stock held by management and board members of Aarrowcast and defendants. Compl. ¶¶ 18–19. Defendant Whitney, a private equity firm, controlled Aarrowcast through a corporate structure involving defendants Holdings and Acast, in which Holdings directly owned Aarrowcast stock. *Id.*

Within Whitney and its subsidiaries, Robert Williams, a Senior Managing Director, bore primary responsibility for overseeing Aarrowcast. Williams and three other Whitney personnel constituted a majority of Aarrowcast board of directors, with Williams serving as Aarrowcast's President and Chairman of the Board. Compl. ¶¶ 20–21. Sam Khoury, an Operating Partner,[7] also participated in defendants' management of Aarrowcast (*see* Compl. ¶¶ 39–40) and personally owned 0.6% of Aarrowcast's shares. Compl. ¶ 19.

IOP is a subsidiary of the private equity firm Industrial Opportunity Partners, LLC. Compl. ¶ 6.

### II. THE SALE TO IOP

#### A. Negotiations and Due Diligence

In May 2012, the parties to this case began to discuss a sale of Aarrowcast from Holdings to IOP. Compl. ¶ 24. The first step was a presentation to IOP by Aarrowcast's management, emphasizing Aarrowcast's strong growth prospects and valuable contracts. *Id.* Over the following months, Aarrowcast and defendants continued to present a "growth story" to IOP; Aarrowcast provided IOP with an optimistic business plan for fiscal year 2013, and a Holdings representative described Aarrowcast's business as so strong that Aarrowcast had to turn away customers. Compl. ¶¶ 25–26.

In the weeks leading up to the transaction, IOP also enjoyed "reasonable access" to Aarrowcast's personnel, premises, and books and records, and opportunities to interview seven major customers and two major suppliers. Stock Purchase Agreement, Compl., Exs. C, C–1 ("SPA") at §§ 6.4, 8.1(i), (j). At least one of these interviews took place after the August 4 execution of the Stock Purchase Agree-

---

**6.** Facts are taken from the First Amended Complaint (Nov. 14, 2014, ECF No. 28) ("Compl.").

**7.** Defendants dispute whether Khoury was affiliated with defendants. At this stage, we assume the Complaint's allegation that Khoury was an "Operating Partner" who spent 3–4 days per week managing "many aspects of [Aarrowcast]'s business," Compl. ¶ 56. This allegation is plausible in light of emails attached to the Complaint suggesting that Khoury exercised some authority over Aarrowcast on behalf of defendants. *See* Compl. Exs. F, G.

ment but before the August 14 closing. *See* Compl. ¶¶ 42 (describing a customer meeting on August 7). IOP would have been entitled to cancel the transaction if any of those post-Agreement interviews had revealed a material misrepresentation on the part of Aarrowcast, *see* SPA § 8.1(a).

In negotiating and executing the Stock Purchase Agreement, IOP was represented by the law firm Schiff Hardin LLP, while Holdings (together with other sellers) was represented by the law firm Morrison Cohen LLP. *See* SPA § 12.6.

## B. *The Stock Purchase Agreement*

The Stock Purchase Agreement provided that defendant Holdings would sell its entire majority interest in Aarrowcast to IOP. SPA § 2.1. Other shareholders, including defendants' and Aarrowcast's personnel, also sold their shares to IOP, *see id.*, but it appears that certain Aarrowcast executives (CEO R. Ben Grigg, Senior Vice President Charles Armor, and CFO Jon Moreau), retained economic interest in Aarrowcast through a "Contribution and Subscription Agreement" that is not part of our record. *See* SPA at 5 and at signature pages listing "Rollover Sellers."

Of greatest significance to this case are the terms relating to representations and warranties[8] in favor of IOP. These representations are laid out in Articles III and IV of the Stock Purchase Agreement: Article III contains representations concerning Aarrowcast and its business, while Article IV contains representations concerning each of the sellers (including defendant Holdings). In parallel with this structure, the preambles of Articles

III and IV attribute the Article III representations to Aarrowcast and the Article IV representations to the sellers. *Compare* SPA art. III ("[Aarrowcast] hereby represents and warrants to Buyer ...") *with* art. IV ("Each Seller hereby, severally and not jointly, represents and warrants to Buyer as to him, her or itself, ...").

The four representations relevant to this case each concern Aarrowcast. Thus, they are found in Article III and are explicitly attributed to Aarrowcast.

*First,* Article III states: "The Projections represent [Aarrowcast's] good faith estimate of future financial performance and are based on assumptions believed by [Aarrowcast] to be fair and reasonable at the time such Projections were prepared." SPA § 3.5(b) (the "Projections Representation"). The "Projections" referred to in this representation are "certain projections, estimates and other forecasts and certain business plan information" that IOP received "[i]n connection with [its] investigation of [Aarrowcast]." SPA § 5.8. Aside from the Projections Representation, IOP disclaimed any reliance on Aarrowcast's or defendants' projections. *See id.*

*Second,* Article III states: "Except as set forth in Section 3.6(a) of the Company Disclosure Schedule,[9] since the date of the Base Balance Sheet [i.e., June 30, 2011], ... there has been: (i) no Material Adverse Change." SPA § 3.6 (the "Material Adverse Changes Representation"); *cf.* SPA § 3.5(a) (defining the "Base Balance Sheet" to be Aarrowcast's balance sheet as of June 30, 2011). For a change in Aarrowcast's circumstances to qualify as a

---

**8.** Each of the representations in the Stock Purchase Agreement is also a warranty and vice versa. For simplicity, we will simply refer to them as "representations" except where their character as warranties is significant.

**9.** The Company Disclosure Schedule discloses no Material Adverse Changes.

"Material Adverse Change," the change (1) must have had a material adverse effect and (2) must not have arisen from an "adverse change in the general business or economic conditions generally affecting the industries in which [Aarrowcast] operates," unless Aarrowcast suffered disproportionately relative to similarly situated businesses. SPA at 10.

*Third,* Article III states:

Except as set forth in Section 3.11(b) of the Company Disclosure Schedule [10] ... no party to any of the Material Contracts has exercised termination rights with respect thereto (and, to the Knowledge of [Aarrowcast], no party has (or will have due to the Closing) any right to accelerate, modify, cancel or terminate in any respect, any Material Contract), and no party has given written notice of any significant dispute with respect to any Material Contract....

SPA § 3.11(b) (the "Contracts Representation"). Aarrowcast's contract with CNH is a "Material Contract." *See* SPA at Company Disclosure Sched. § 3.11(a)(i)(13).

*Fourth,* Article III states:

No Material Customer has terminated, canceled or otherwise materially and adversely modified its relationship with [Aarrowcast] or its subsidiaries or, to the Knowledge of [Aarrowcast], has any plan or intention to terminate, cancel or otherwise materially and adversely modify its relationship with [Aarrowcast] or its Subsidiaries. Neither [Aarrowcast] nor any of its Subsidiaries is involved in any material dispute with any Material Customer.

SPA § 3.19 (the "Customers Representation"). The list of "Material Customers" is undisputed (at least for purposes of this motion), and includes CNH, Hy Pro, Covert Manufacturing, Meta Manufacturing,

and Valmont Industries. *See* SPA at Company Disclosure Sched. § 3.19.

Several provisions of the Stock Purchase Agreement make it clear that IOP relied only on the Agreement's express representations, and that Aarrowcast and defendants made no other representations. For example, at the end of Article III, the Agreement provides that, "[e]xcept as expressly set forth in this Agreement ..., Sellers make no representation or warranty ... in respect of [Aarrowcast]." SPA § 3.28. More generally, IOP made its own representations that IOP (1) "is not relying ... upon any advice, counsel or representations ... of Sellers or [Aarrowcast], other than the express representations and warranties made by Sellers in this Agreement," SPA § 5.7(a)(ii); (2) "is entering into and delivering this Agreement ... with a full understanding of all the terms, conditions and risks thereof (economic and otherwise), and it is capable of and willing to assume (financially and otherwise) those risks," SPA § 5.7(a)(v); and (3) "is a sophisticated entity familiar with transactions similar to those contemplated by this Agreement," SPA § 5.7(a)(vi). IOP further acknowledged that neither the sellers, Aarrowcast, nor their affiliates had "made any representation or warranty, expressed or implied, as to [Aarrowcast] or any of its Subsidiaries ... except as expressly set forth in this Agreement (or in any certificate delivered pursuant hereto)." SPA § 5.10. Finally, the Agreement contains an integration clause: "This Agreement (including the documents referred to herein) constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties...." SPA § 12.2.

---

10. The Company Disclosure Schedule discloses no exceptions to this representation.

The sellers (including Holdings) agreed to indemnify IOP for breaches of the warranties in Articles III and IV. The indemnification provision states:

> Subject to the limitations set forth in this Article X, in the event of any breach or inaccuracy of the representations and warranties, or covenants or agreements, of ... Sellers [11] set forth in this Agreement, and, provided that [IOP] makes a written claim for indemnification to [Holdings] ... within the applicable survival period ..., then ... Sellers (i) severally, but not jointly, with respect to breaches of the ... warranties set forth in Article IV, and (ii) jointly and severally with respect to breaches of all other ... warranties ... of Sellers and [Aarrowcast] set forth herein, shall indemnify and hold harmless all Buyer Indemnitees [i.e., IOP] *from and against any Adverse Consequences* the Buyer Indemnitees [including IOP and Aarrowcast itself] shall suffer relating to: (i) any breach or inaccuracy of ... the ... warranties ... of [Aarrowcast] or any Seller contained in this Agreement [ ]. . . .

SPA § 10.2(a).

The sellers' responsibility for breaches of warranty under section 10.2(a)(i) is limited to $5 million. *See* SPA § 10.2(b). As relevant here, the only exception to this cap is in the event of "fraud, intentional misrepresentation *or willful misconduct.*" SPA § 10.2(b)(D).

## C. *The Alleged Fraud*

IOP alleges fraud, securities fraud, and breaches of warranties on two sets of facts.

First, that Aarrowcast's largest customer, CNH, was overstocked with Aarrowcast products and wished to renegotiate its Aarrowcast contract to reduce its orders. Second, that several other major customers also planned to reduce orders.

### 1. *CNH Contract Renegotiation*

In July 2011, Aarrowcast and CNH entered into a "take or pay" contract that effectively required CNH to purchase 1,051 units each week from Aarrowcast's Georg Fischer line, representing 45% of Aarrowcast's capacity on that line. *See* Compl. ¶ 15.

With this "take or pay" contract, CNH bit off more molded iron than it could chew. As early as March or April 2012, Thomas Frank (Aarrowcast's Vice President of Sales & Marketing) heard rumors that CNH had excess inventory of Aarrowcast's products and was not meeting its own production targets. Compl. ¶ 38. In June or early July 2012, Frank visited CNH and saw for himself that CNH had substantial excess inventory. *Id.*

On July 23, 2012, Sam Khoury (a Whitney Operating Partner) encountered CNH's purchasing agent, Tim Karevich. Karevich told Khoury that CNH "was overstocked and wanted to discuss the issue." Khoury Email, Compl. Ex. F. Khoury then informed Charles Armor (Aarrowcast's Senior Vice President of Marketing) of his conversation with Karevich. *Id.*

On July 25, R. Ben Grigg (Aarrowcast's CEO) emailed several senior managers to

---

**11.** This indemnification clause in inconsistent as to whether it applies to breaches of the *sellers'* warranties (as stated here) or to breaches of the *sellers' and Aarrowcast's* warranties (as stated later in this provision. At oral argument, defense counsel conceded that the indemnification clause applies to Aarrowcast's warranties as well as the sellers', and we agree that this interpretation is consistent with the structure of the Stock Purchase Agreement. *See* Tr. of Oral Arg. at 22:16–18 (statement of defendants' counsel) ("So, yes, the sellers were standing behind the company's representations for purposes of indemnification, but only up to a cap.").

set up a meeting the next morning. Grigg Email, Compl. Ex. H. In this email, Grigg said that he was "particularly concerned about" twelve items, including "d. CNH—contracted amounts . . . . expect to push out . . . . . seek out an 'evergreen' clause or pay up." *Id.* (extended ellipses in original).

On July 26 (the same day as Grigg's meeting), Khoury spoke with Robert Williams (the Whitney executive with primary responsibility for Aarrowcast, and a manager, officer or director of all three defendants), and then told Armor on July 26 that Williams planned to call Armor. *See* Khoury Email, Compl. Ex. G. Khoury's email does not say what he discussed with Williams, but IOP suggests we infer from the timing and the persons involved that Khoury discussed CNH's excess inventory with Williams.

On August 2, Karevich emailed Armor to arrange a discussion of the CNH contract on August 7, when Karevich was already scheduled to meet with IOP representatives. Compl. ¶ 41. Karevich told Armor that they should discuss the CNH contract outside of IOP's presence, and Armor agreed that he would try to come early to meet with Karevich. Karevich–Armor Emails, Compl. Ex. I. The next morning, August 3, Armor asked Williams for an urgent " ' less than 2 minute' phone conversation." Armor Email, Compl. Ex. J. (It is unclear from the materials incorporated into the Complaint whether Armor actually met with Williams on August 3 on with Karevich on August 7.)

Karevich met with Armor on Friday, August 10, and asked Armor to relieve CNH from CNH's minimum purchase requirement. Compl. ¶ 43. Sometime that weekend (August 11 or 12), Armor called Williams and told Williams about CNH's request. Compl. ¶ 44.

Nobody from Aarrowcast or defendants informed IOP that CNH wished to renegotiate its minimum purchase requirement, *id.*, and the Complaint does not allege that IOP agents asked any relevant questions to CNH at IOP's meeting with CNH on August 7. Instead, IOP completed its purchase on schedule on August 14. Compl. ¶¶ 32, 35.

On August 21 (one week after the closing), Karevich sent Armor an email on behalf of CNH seeking to reduce CNH's mandatory orders during 2012 and to restructure CNH's contract with Aarrowcast. Specifically, Karevich asked for a six-week hiatus in orders, followed by a 30% reduction in orders for the rest of 2012, and an agreement that would "accommodate fluctuation in customer demand" for three years thereafter. Karevich Email, Compl. Ex. E. The reason for these requests, according to Karevich, was "excessive inventory" in light of "a change in customer demand." *Id.*

Karevich's email did not say that CNH desired to end its relationship with Aarrowcast. Quite to the contrary, Karevich wrote "that our intent is to continue a long relationship with Aarrowcast" and cited an order for "Unloader Elbow Tube[s]" and a quote request for "India Axle[s]" as evidence of CNH's "intent to keep our relationship strong." *Id.*

Karevich's email did not deny that Aarrowcast was entitled to hold CNH to the terms of its existing contract. *See id.* Realistically speaking, though, CNH presented Aarrowcast with a Hobson's choice. Either Aarrowcast could acquiesce to CNH's demands, or CNH would stop ordering *any* Georg Fischer products for up to six months once CNH's existing contract expired. *See id.* As a result, CNH agreed to reduce CNH's weekly obligation by over 50% in the fourth quarter of 2012, with CNH's obligation gradually rising

back to 1,000 molds per week in the second half of 2013. Compl. ¶ 45.

### 2. *Internal Sales Projections*

Also in July 2012, managers at Aarrowcast began a project to update its sales forecasts in advance of the sale to IOP. Compl. ¶ 46. Charles Armor told Thomas Frank and Marty Martin (a Product Development Manager for Aarrowcast) to ask customers about plans for orders in 2013. *Id.* Frank and Martin divided up most of the customers, but Armor planned to contact CNH himself. Compl. ¶ 47.

Both Martin and Frank finished collecting their information in July. Compl. ¶ 48. Martin circulated a spreadsheet of his results to Armor and Frank by July 31, but Frank did not circulate his spreadsheet until August 15 (after the contract execution and the closing). *Id.*

The updated information showed that four "Material Customers" informed Aarrowcast that they planned to reduce their orders by at least one-third, compared to the projections that Aarrowcast had given to IOP. *See* Compl. ¶ 49 (listing sales projections for Covert Manufacturing, Hy Pro, Meta Manufacturing, and Valmont Industries).

On August 1, Armor wrote in an email to other Aarrowcast managers, "Business is falling like a rock." Armor Email, Compl. Ex. M.[12] On the same email thread, Armor emphasized an argument about production planning by stating, "We will need every possible pound of business we can find this fall." Armor Email, Compl. Ex. N.

As with the CNH situation, nobody from Aarrowcast or defendants informed IOP about Aarrowcast's updated projections or about Armor's general sense that business was declining. Compl. ¶ 53. The Complaint does not, however, allege that anybody at Aarrowcast informed defendants either. Rather, the Complaint concludes that defendants "either knew … or [acted] in conscious disregard for" the inaccuracy of various representations concerning Aarrowcast's business prospects. Compl. ¶ 54. To bolster this conclusion, the Complaint states that defendants did not affirmatively confirm the accuracy of the representations (supposedly because defendants' agents knew that the representations would turn out to be inaccurate); that Whitney assigned Williams to monitor Aarrowcast and to oversee the sale to IOP; that Williams was in "close contact" with Aarrowcast management during the sales process, speaking frequently with Armor; that Khoury devoted 3–4 days per week to Aarrowcast business; and that defendants had a motive for hiding bad news from IOP. Compl. ¶¶ 55–56.

After the closing, Aarrowcast's sales performed in line with the information that Aarrowcast gathered in July 2012. Compl. ¶ 57.

To adjust to the sharp decrease in sales (both to CNH and to other customers), Aarrowcast laid off 91 employees, eliminated overtime, moved some operations to off-

---

12. The context of Armor's email is this: An Aarrowcast customer had written Frank to complain that Aarrowcast was failing to deliver as many parts as Aarrowcast had promised. In forwarding the customer's complaint to managers in Aarrowcast's operations department, Frank wrote: "Business is falling like a rock and this guy has to beg for parts. Exactly what is Aarrowc[a]st[']s strategy? Its obviou[s] that sales doesn[']t know." Armor Email, Compl. Ex. M. The fact that Frank felt comfortable writing "Business is falling like a rock", without further explanation in a short email on a different subject plausibly suggests that Aarrowcast's declining business was common knowledge among Aarrowcast management.

peak hours to save money on electricity, and discontinued its 401(k) match. Compl. ¶ 58. Even with these "extraordinary efforts," Aarrowcast's net sales were 23 or 24 percent below the sales forecasted to IOP, and Aarrowcast's EBITDA (earnings before interest, taxes, depreciation, and amortization) was 39 percent below the forecasted EBITDA. *Id.*

## DISCUSSION

### I. OVERVIEW

#### A. *Pleading Standards*

When deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, we must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 237 (2d Cir.2007). In general, a plaintiff's factual allegations "must be enough to raise a right of relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal citation omitted). If the plaintiff has not "nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570, 127 S.Ct. 1955; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 684, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (applying *Twombly* to "all civil actions").

To state a fraud claim (including a securities law claim sounding in fraud), the plaintiff "must state with particularity the circumstances constituting fraud." Fed. R.Civ.P. 9(b); *see also Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir.2004). To do so, the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach*, 355 F.3d at 170 (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)). Although "intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed.R.Civ.P. 9(b), the plaintiff must still "allege facts that give rise to a strong inference of fraudulent intent." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994).

With respect to a private claim brought under Rule 10b–5, the Private Securities Litigation Reform Act (PSLRA) [13] requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement ... is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." § 78u–4(b)(2)(A).

Congress modeled the PSLRA on the Second Circuit's "strong inference" gloss on Rule 9(b). *See* 141 Cong. Rec. 38,323 (1995) (statement of Sen. Pete Domenici) ("[I]t is the Second Circuit's pleading standard."); *id.* at 37,802 (statement of Rep. Zoe Lofgren) ("The President says he supports the [S]econd [C]ircuit standard for pleading. So do I. That is what is included in this bill."). Moreover, although the PSLRA does not necessarily codify all of the Second Circuit's Rule 9(b) case law, *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499, 168

---

**13.** Private Securities Litigation Reform Act of 1995, Pub.L. No. 104–67, 109 Stat. 737 (codi- fied in scattered sections of 15 U.S.C.).

L.Ed.2d 179 (2007), the Second Circuit has generally relied on its own Rule 9(b) precedent to evaluate complaints under the PSLRA standard. *See ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,* 553 F.3d 187, 198–99 (2d Cir.2009) (citing *Ganino v. Citizens Utils. Co.,* 228 F.3d 154 (2d Cir.2000), and *Novak v. Kasaks,* 216 F.3d 300 (2d Cir. 2000)); *Ganino,* 228 F.3d at 168–70 (applying Rule 9(b) cases to PSLRA analysis); *Novak,* 216 F.3d at 311 (instructing district courts to consider Rule 9(b) analysis in PSLRA analysis). Accordingly, we treat the two "strong inference" standards as essentially the same.[14]

 Under this standard, a "strong inference" arises if the complaint "either (a) ... alleg[es] facts to show that defendants had both motive and opportunity to commit fraud, or (b) ... alleg[es] facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Novak,* 216 F.3d at 307 (quoting *Acito v. IMCERA Grp., Inc.,* 47 F.3d 47, 52 (2d Cir.1995), and *Shields,* 25 F.3d at 1128). As to the first method of pleading, motive may be alleged by showing that the defendant "benefitted in some concrete and personal way from the purported fraud." *ECA, Local 134,* 553 F.3d at 198 (quoting *Novak,* 216 F.3d at 307–08). As to the second method of pleading, conscious misbehavior or recklessness may be alleged by showing that the defendants "engaged in deliberately illegal behavior," "knew facts or had access to information suggesting that their ... statements were not accurate," or "failed to check information they had a duty to monitor." *ECA, Local*

*134,* 553 F.3d at 199 (quoting *Novak,* 216 F.3d at 311).

**B. *Elements of Claims***

 To sustain an indemnification claim for breach of warranty, IOP must adequately plead the existence of a contract in which defendant promised to indemnify IOP for breaches of a warranty, and the existence of a breach of that warranty. *See Ainger v. Mich. Gen. Corp.,* 476 F.Supp. 1209, 1225–26 (S.D.N.Y.1979).

 To sustain a securities fraud claim on a primary-violator theory, IOP must adequately plead (1) a material misrepresentation by the primary violator; (2) scienter; (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) causation of the economic loss. *See Levitt v. J.P. Morgan Sec., Inc.,* 710 F.3d 454, 465 (2d Cir.2013) (citing *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.,* 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008)).

 To sustain a securities fraud claim on a control-person theory, IOP must adequately plead (1) the existence of a primary securities fraud violation; (2) control of the primary violator by the defendant; and (3) culpable participation "in some meaningful sense" by the defendant. *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 108 (2d Cir.2007).

 To sustain a fraud claim under New York common law, IOP must adequately plead (1) a misrepresentation or a material omission of fact; (2) defendants' knowledge that the misrepresentation was

**14.** One possible exception is that the PSLRA additionally requires facts supporting the "strong inference" to be stated "with particularity." *See Novak,* 216 F.3d at 310; *cf.* 141 Cong. Rec. at 38,323 (statement of Sen. Domenici) ("The Senate ... provision provided that the complaint must specifically allege facts giving rise to a strong inference. The conference report states that the complaint must 'state with particularity fact[s] ...' There is no difference between these two statements of the law. The change was made at the request of the Judicial Conference.") (quoted ellipses in original).

false; (3) defendants' intent to deceive and to induce reliance; (4) IOP's justifiable reliance; (5) injury to IOP; and (6) proximate causation of the injury. *See Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir.2009) (citing *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370, 1373 (1996)); *Suez Equity Invs., L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 104–05 (2d Cir.2001) (citing *Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 250 N.E.2d 214, 217 (1969)).

### C. *Outline of Legal Issues*

Defendants challenge the Amended Complaint on several grounds, most of which cut across several of IOP's claims. As a guide to the following discussion, we list the bases for defendants' motion, which claims are challenged by each legal argument, and our resolution of each argument.

*First,* defendants argue that pleaded facts do not contradict the Stock Purchase Agreement's representations and warranties. We conclude that IOP has only adequately pleaded facts showing that the Projections and Customers Representations were false. Because the existence of a misrepresentation or breach of warranty is essential to each cause of action, we dismiss all claims insofar as they arise from other representations in the Stock Purchase Agreement.

*Second,* defendants rely on Supreme Court precedent to argue that Holdings did not "make" any representations, and therefore cannot be a primary violator of Rule 10b–5. We conclude that, on the pleaded facts, Holdings "made" the Article III representations for purposes of Rule 10b–5, even though the Stock Purchase Agreement formally attributed those rep-

resentations to Aarrowcast. Therefore, we do not dismiss any claim on this basis.

*Third,* defendants argue that IOP has not adequately pleaded culpable participation, as necessary to state a securities law claim on a control-person theory. Along the same lines, defendants argue that IOP has not adequately pleaded Holdings' scienter, so as to state a common law fraud claim or a securities law claim against Holdings on a primary-violator theory. We conclude that IOP has pleaded defendants' culpable participation and scienter with particularity as to the facts involving CNH, but not as to the facts involving other Aarrowcast customers. Therefore, we dismiss the securities law claims and the common law fraud claims with respect to the facts involving customers other than CNH.[15]

*Fourth,* defendants argue that IOP has not adequately pleaded scienter on the part of Aarrowcast, as necessary to state a securities law claim against defendants as control persons of Aarrowcast. We conclude that IOP has pleaded Aarrowcast's scienter with particularity as to the facts involving CNH and the facts involving other material customers of Aarrowcast. Therefore, we do not dismiss any claim on this basis.

*Fifth,* defendants argue that IOP has not adequately pleaded reasonable reliance on the Stock Purchase Agreement's representations, as necessary to state a securities law claim or a common law fraud claim. To support this conclusion, defendants argue that IOP's reliance was facially unreasonable and that IOP disclaimed reliance (reasonable or not) in the Stock Purchase Agreement. We conclude that IOP has adequately pleaded reasonable reliance, and therefore do not dismiss any claim on this basis.

---

**15.** The indemnification claim does not sound in fraud, so it survives with respect to the non-CNH allegations.

*Sixth,* defendants argue that IOP may not, as a matter of law, pursue a common law fraud claim on facts arising out of representations within a contract. We conclude that IOP may state a fraud claim because the relevant representations concern facts collateral to defendants' intent to perform the contract. IOP's claims also independently survive with respect to consequential monetary damages that could not be recovered through a contract claim. Therefore, we do not dismiss any claim on this basis.

*Seventh,* defendants argue that IOP may not, as a matter of law, obtain rescission of the Stock Purchase Agreement because IOP failed to pursue rescission with adequate diligence. We conclude that this question is more appropriate to resolve at the summary judgment stage or at trial, and therefore do not dismiss any claim on this basis.

Defendants do not dispute that IOP has adequately pleaded (1) the existence, validity, and literal content of the Stock Purchase Agreement; (2) the applicability of federal securities laws to the Stock Purchase Agreement; (3) the materiality element of IOP's securities law claims (assuming that a misrepresentation is pleaded); (4) defendants' status as control persons of Aarrowcast; or (5) damages and loss causation (assuming again that a misrepresentation is pleaded).

## II. *RESOLUTION OF LEGAL ISSUES*

### A. *Existence of Misrepresentations*

#### 1. *Financial Statements*

The Projections Representation in the Stock Purchase Agreement states: "The Projections represent [Aarrowcast's] good faith estimate of future financial performance and are based on assumptions believed by [Aarrowcast] to be fair and reasonable at the time such Projections were prepared." SPA § 3.5(b).

It is common ground that this sentence makes two distinct representations: first, that the Projections represented a good-faith estimates; second, that the Projections were based on assumptions that Aarrowcast believed to be fair and reasonable. It as also common ground that Aarrowcast's second representation (that the Projections were based on reasonable assumptions) was true.

The dispute, therefore, centers around how to interpret the first representation, that the Projections represented Aarrowcast's good-faith estimate of future financial performance. In particular, the parties disagree as to whether the phrase "at the time such Projections were prepared" modifies the first representation. Defendants read the phrase "at the time such Projections were prepared" to modify both representations, so that Aarrowcast certified only that the Projections were Aarrowcast's good-faith estimates at the moment that Aarrowcast prepared the Projections. IOP reads the same phrase to modify only the "based on fair and reasonable assumptions" portion of the sentence, so that the Projections were required to be good-faith estimates continuously through the date of execution or even the closing.[16]

*A priori,* neither reading leads to a representation that would be unreasonable to

---

**16.** Section 8.1(a) relieves IOP of the duty to close if any representation was false as of the closing, excepting representations that were specifically made as of some other date. That section contains what we take to be a drafting error. It literally provides that representations "that are *not* qualified as to 'materiality' " must be "true and correct in all *material* respects as of the Closing," while representations "that *are* qualified as to 'materiality' "

include in a contract. A buyer in IOP's position might desire a seller to promise that, at the time of execution, the seller still trusts projections that were previously created—even if the buyer otherwise assumes the risk that the projections are incorrect. On the other hand, a seller in Holdings' position might desire to limit its representations to the moment when the seller (or its affiliate) created the projections.

There are at least some reasons to favor IOP's reading. It would be awkward for the past-tense phrase "at the time such Projections *were* prepared" to modify the present-tense verb "represent," and nearly as awkward for the phrase "at the time such Projections were prepared" to modify both a noun ("estimate") in the first half of the sentence and a verb or adjective ("believed" or "fair and reasonable") in the second half. Moreover, when a temporal limitation is intended to restrict an entire representation, the Stock Purchase Agreement generally places the temporal restriction at the beginning of the representation. *See, e.g.,* SPA §§ 3.3(a), 3.6(a), 3.8(h), 3.26, 5.6(b).

On the other hand, IOP's reading would be clearer if a comma or semicolon were placed immediately after the word "performance." Furthermore, the extraordinarily broad disclaimer of section 5.8 [17] suggests that section 3.5(b) should be interpreted as narrowly as possible, against IOP, because IOP expressly undertook to evaluate the Projections on its own. The last sentence of section 5.8 is particularly hard to square with a broad reading of section 3.5(b), as it appears to deny the very existence of section 3.5(b).

At bottom, neither party's reading is completely implausible or unreasonable. We cannot decide at this stage precisely which combination of the words "represent," "estimate," "based," "believed," "fair," and "reasonable" is modified by the critical temporal limitation. Therefore, the parties may submit additional evidence or argument at summary judgment or at trial, although the parties may find it unnecessary to develop this question further, given our holding (*see infra,* II.A.4.) that IOP has alleged facts sufficient to contradict one other representation.

### 2. *Material Adverse Changes*

■ Defendants next argue that IOP has not pleaded that the Material Adverse Changes Representation was inaccurate,

---

must be "true and correct in *all* respects," SPA § 8.1(a)(i), (ii) (emphases added). The reverse was surely intended. This error does not affect the present motion, because materiality is not in dispute.

In mentioning section 8.1(a), we do not decide whether IOP may base its fraud and indemnity claims on a statement that was true on the date of execution (August 4, 2012) but false on the date of closing (August 14, 2012). We may eventually have to address this question, as certain events related to CNH allegedly occurred between those two dates.

17. In full:

Subject to. Section 3.5(b), [IOP] acknowledges that there are uncertainties inherent in attempting to make such projections, estimates and other forecasts and plans, that [IOP] is familiar with such uncertainties, that [IOP] is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections, estimates and other forecasts and plans so furnished to it, and any use of or reliance by Buyer on such projections, estimates and other forecasts and plans shall be at its sole risk, and, without limiting any other provisions herein, that [IOP] shall have no claim against anyone with respect thereto. Accordingly, [IOP] acknowledges, agrees and confirms that each Seller, [Aarrowcast] and each of their respective Affiliates and Representatives, do not make, have not made nor shall be deemed to have made any representation or warranty to [IOP], express or implied, at law or in equity, with respect to such projections, estimates, forecasts or plans.

because order reductions were not "Material Adverse Changes" as defined in the Stock Purchase Agreement.

IOP has pleaded that Aarrowcast knew about major customers' plans to decrease orders significantly, a change that surely qualifies as both "material" and "adverse." Yet this is not the end of the analysis, for a change to Aarrowcast's business is not a "Material Adverse Change" simply because the change is both material and adverse. The Stock Purchase Agreement's definition of "Material Adverse Change" specifically excludes changes that arose from "any adverse change in the general business or economic conditions generally affecting the industries in which [Aarrowcast] or any of its Subsidiaries operates," unless the change in business or economic conditions had a "disproportionate effect" on Aarrowcast "relative to other similarly-situated Persons." SPA, Def'n of "Material Adverse Change," first proviso, cl. i; *id.* at second proviso.

The Amended Complaint does not posit any explanation other than "general business or economic conditions" for customers to reduce their orders. Indeed, Aarrowcast's CEO remarked that he was concerned about "[t]he general state of the economy and its [e]ffect on the demand for castings," Grigg Email, Compl. Ex. H, and the fact that several major customers simultaneously wanted to reduce orders suggests that conditions were generally unsteady.

Nor does the Amended Complaint allege that industry conditions affected Aarrowcast more than other castings companies. Thus, IOP has not alleged the existence of a Material Adverse Change.

### 3. *Contracts and Arrangements*

■ Defendants next argue that IOP has not pleaded that the Contract Representation was inaccurate, because no party to the Stock Purchase Agreement had received "written notice of any significant dispute with respect to any Material Contract." SPA § 3.11(b).

Defendants are correct. Even after the Aarrowcast sale, CNH never disputed its "take or pay" commitment and never purported to exercise a right to accelerate, modify, cancel, or terminate its contract. CNH was willing to comply with its contract, although CNH warned that strict compliance would result in a long gap in orders after the contract expired.

### 4. *Customers*

■ Defendants next argue that IOP has not pleaded that the Customer Representation was inaccurate, because no "Material Customer" had "terminated, canceled or otherwise materially and adversely modified its relationship with [Aarrowcast]" or had "any plan or intention" to do so.

The more natural reading is that "relationship" is an all-encompassing term for all of a customer's dealings with a vendor. A relationship is not simply measured in contracts signed, orders placed, prices agreed to, and payments received, but also includes a customer's informal requests, its complaints, and its inchoate plans and hopes for future dealings. *Cf.* Karevich Email, Compl. Ex. E (assuring Aarrowcast that CNH wished to maintain a "long relationship" despite an immediate reduction in orders).

IOP has pleaded that CNH had excess inventory in 2012 and was pursuing an Aarrowcast sales executive to discuss its "take or pay" contract with CNH. On these facts, it is reasonable to infer that Aarrowcast knew that CNH was considering a significant reduction in orders, either by renegotiating the existing contract or by reducing orders after the existing contract expired. Either way, CNH's relationship with Aarrowcast was materially

different from the relationship that had existed previously.

Similarly, although other Material Customers were not bound by guaranteed-order contracts, their stated plans to reduce orders constituted material and adverse modifications of those customers' relationships with Aarrowcast and were known to Armor or Frank before the Stock Purchase Agreement was executed.

Thus, the facts in the Amended Complaint amply plead that the Customer Representation was false.

### B. *Attribution of Misrepresentations*

■ As one of two alternative theories, IOP pleads that Holdings (the seller of Aarrowcast) was a "primary violator" of SEC Rule 10b–5. This theory can survive only if Holdings itself *"ma[d]e* [an] untrue statement."[18] SEC Rule 10b–5 (emphasis added).

The leading case interpreting the word "make" in Rule 10b–5 is *Janus Capital Group, Inc. v. First Derivative Traders,* —— U.S. ——, 131 S.Ct. 2296, 180 L.Ed.2d 166 (2011). In *Janus,* the Court held that a mutual fund's investment adviser could not be liable as a primary violator because the mutual fund itself—not its adviser— "made" false statements in the mutual fund's prospectus. "For purposes of Rule 10b–5," the Court wrote, "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether to communicate it." *Janus,* —— U.S. at ——, 131 S.Ct. at 2302. Although the defendant investment adviser had drafted the false statements, the fund itself had a statutory obligation to file its prospectus and had

ultimate authority over the prospectus's content. Therefore, the investment adviser could not be liable as a primary violator under Rule 10b–5.

■ As *Janus* instructed, "attribution within a statement ... is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Id.* Nevertheless, explicit attribution is not absolutely dispositive. The ultimate test is whether a particular defendant " ' made it necessary or inevitable' that 'any falsehood w[ould] be contained in the statement.' " *In re Lehman Bros. Sec. & ERISA Litig.,* No. 09–md–2017 (LAK), 2013 WL 5730020 at *2, 2013 U.S. Dist. LEXIS 152801 at *6 (S.D.N.Y. Oct. 22, 2013) (quoting *Janus,* —— U.S. at ——, 131 S.Ct. at 2303).

Even after *Janus,* some courts have held that the sole owner of a company "made" a statement that the company itself formally made in connection with its securities offering. *See City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.,* 814 F.Supp.2d 395, 416–18 (S.D.N.Y.2011); *see also Carpenters Pension Trust Fund of St. Louis v. Barclays PLC,* 56 F.Supp.3d 549, 557–60, 2014 WL 5334053 at *5–6 (S.D.N.Y.2014). In *City of Roseville,* but not in Janus, the defendant owned the company to whom the false statements were formally attributed, the defendant exerted "direct control over all corporate transactions," and the defendant could "determine when and whether to sell the shares being sold." 814 F.Supp.2d at 418.

■ Here too, Holdings owned an overwhelming majority of Aarrowcast's shares; employees of Holdings (or of its corporate affiliates) formed a majority of

---

**18.** This point does not bear on the state-law fraud claim, *see In re Optimal U.S. Litig.,* 837 F.Supp.2d 244, 262–64 (S.D.N.Y.2011), because, under New York law, a party is liable for fraud if it "makes," "authorizes," or

"causes" a misrepresentation. *See Allstate Ins. Co. v. Countrywide Fin. Corp.,* 824 F.Supp.2d 1164, 1186 (C.D.Cal.2011) (applying New York law); 60A N.Y. Jur.2d *Fraud and Deceit* § 201 (2d ed.2011).

Aarrowcast's board; Holdings decided whether to sell Aarrowcast to IOP; Holdings employees allegedly negotiated the Stock Purchase Agreement without any meaningful participation from Aarrowcast's own managers; a Holdings executive signed the Stock Purchase Agreement on behalf of Aarrowcast (in his dual capacity as an Aarrowcast officer). On these facts, we agree with IOP that the Article III representations may be imputed to Holdings for purposes of federal securities law.

This case is distinguishable from *Janus* in yet another way. In *Janus*, federal securities law required the mutual fund—and not the defendant investment adviser—to file the prospectus that allegedly contained a false statement. Because federal law determined which entity had a duty to file the prospectus, it would have been anomalous for another provision of securities law, Rule 10b–5, to recognize a different entity as the maker of the statements in the prospectus. Here, however, the parties to the Stock Purchase Agreement attributed the Article III representations to Aarrowcast for reasons wholly unrelated to federal securities law: according to defendants themselves, the parties wished to limit the sellers' contractual liability to the limited indemnification provided for in Article X. *See* Tr. of Oral Arg. at 18:2–13 (description by plaintiff's counsel); *id.* at 22:16–18 (description by defendants' counsel). Thus, there is less reason here than in the usual case to assume that Aarrowcast "made" the statements for purposes of federal securities law.

For these reasons, we conclude that the Amended Complaint sufficiently pleads that Holdings "made" the representations in Article III.[19]

## C. *Defendants' Culpable Participation and Scienter*

Next, defendants argue that IOP has failed to plead defendants' culpable participation and scienter with enough cogency and particularity to state fraud and securities law claims.

This is a close question because, while the Amended Complaint pleads extensive facts to show that Aarrowcast managers knowing about Aarrowcast's business problems, the Amended Complaint cites far fewer instances in which *defendants'* personnel learned that same information. Although the Complaint plausibly suggests that Williams and Khoury oversaw Aarrowcast to some extent, there is very little specific documentary evidence to show that they turned their attention to these particular issues. Furthermore, because IOP has by now controlled Aarrowcast for over two years, we would have expected the Amended Complaint to include more substantial documentary evidence of defendants' participation if such evidence existed.

### 1. *CNH*

With respect to CNH's desire to renegotiate its contract, IOP offers two specific pieces of information to show that the defendant entities helped to conceal CNH's situation from IOP.

First, Khoury (allegedly a Whitney Operating Partner) wrote Armor (an Aarrowcast manager) to inform Armor that CNH was overstocked and "wanted to discuss the issue." Compl. Ex. G. This is a weak showing of culpable participation. This email shows, if anything, Khoury's *non-*

---

**19.** The Amended Complaint also adequately pleads that Aarrowcast itself, as the instrument of Holdings, "made" the Article III representations. There is no reason why both entities cannot both "make" the same repre- sentation under Rule 10b–5. *See, e.g., Carpenters Pension Trust Fund*, 56 F.Supp.3d at 558– 60, 2014 WL 5334053 at *6. Therefore, IOP may continue to pursue both theories.

participation in discussions about CNH. In the email, Khoury tells Armor that Khoury encountered CNH's purchasing agent by happenstance, and then immediately withdraws himself from discussions between Armor and CNH because "I am not that close to the situation." *Id.*[20] In this context, where we must examine both IOP's proposed inference and competing inferences, we find the stronger inference to be that Khoury was involved only tangentially in Armor's discussions with CNH, and that he did not know (or consciously avoid knowing) about CNH because the matter was not within his sphere. Accordingly, we assign Khoury's knowledge little weight in our consideration of scienter and culpable participation.

■ IOP's stronger allegation is that Armor called Williams (an agent of all three defendants) and "told him about CNH's request for renegotiation." Armor allegedly called Williams on August 11 or 12, 2012, the weekend immediately after Armor's meeting with CNH's representative and immediately before the closing with IOP. This allegation is sufficiently particular to be considered in our "strong inference" analysis under the PSLRA. The allegation states the date (within a two-day range), the participants, and the essential information that Armor told defendants' agent. Furthermore, this allegation supports a powerful inference of culpability on defendants' part. Defendants allegedly put Williams in charge of overseeing Aarrowcast, and it is evident that Williams had at least some influence over the Stock Purchase Agreement, which he executed on behalf of Acast and Holdings.

Furthermore, defendants had motive and opportunity to commit fraud. The

motive was clear: to close the sale at the negotiated price. Defendants argue that there was no opportunity for fraud because IOP had access to Aarrowcast's records and customers. But IOP had already held its diligence meeting with CNH by the time that Williams spoke with Armor, no further meeting was scheduled, and the closing was imminent. Therefore, it would have been reasonable for Williams to assume that IOP would not learn the truth about CNH before closing.

### 2. *Customers Other Than CNH*

■ By contrast, IOP's allegations are entirely deficient with respect to Aarrowcast's revised projections. Although defendants oversaw Aarrowcast in some general sense, no allegation demonstrates that defendants routinely micro-managed Aarrowcast to such an extent that the defendants must have known about the interim results of a spreadsheet project that an Aarrowcast sales manager (Armor) had initiated. And, although the Amended Complaint alleges that "Armor spoke frequently with Williams ... regarding [Aarrowcast's] performance [and] relevant customer news," there is no *particularized* allegation that Armor told Williams about his project to update Aarrowcast's sales projections. IOP's conclusion that Williams knew (or recklessly avoided knowing) about the new forecasts as they came in is precisely the sort of inference—perhaps plausible, but not particularized or strong—that cannot survive under Rule 9(b) and the PSLRA.

### D. *Aarrowcast's Scienter*

Aarrowcast's own knowledge, on the other hand, is amply pleaded. Armor

---

**20.** Three days later, Khoury also allegedly spoke with Williams at Whitney and told Armor that Williams planned to call Armor. IOP suggests we infer from the timing and the persons involved that Khoury discussed

CNH's excess inventory with Williams. This is not implausible, but there were many other topics that Khoury could have discussed with Williams—most notable, the upcoming transaction with IOP.

knew about CNH's overstocking, met with Karevich (CNH's purchasing agent) to discuss CNH's "take or pay" contract, and was persuaded to discuss the matter with Karevich away from IOP. All this leads to a inference, at least as cogent as any opposing inference, that Armor hid CNH's bad news from IOP. Defendant points out that Armor had no personal motive to conceal CNH's requests from IOP. This may be true, but IOP need not plead a personal motive when the pleaded facts show so clearly that Aarrowcast (through Armor) actually "knew facts" about CNH's request "suggesting that [its] statements were not accurate." *Novak,* 216 F.3d at 311.

Likewise, Aarrowcast (in the persons of Armor and Frank) knew before the closing that other major customers planned to reduce orders. Nevertheless, Aarrowcast represented in Article III that Aarrowcast's relationship with those customers had not materially and adversely changed.

### E. *Reasonable Reliance*
#### 1. *Due Diligence*

Defendants argue that the reasonable reliance element of IOP's fraud claims fails as a matter of law because IOP enjoyed access to Aarrowcast's records, employees, and customers.

 "Reasonable reliance entails a duty to investigate the legitimacy of an investment opportunity where 'plaintiff was placed on guard or practically faced with the facts.'" *Crigger v. Fahnestock & Co.,* 443 F.3d 230, 234 (2d Cir.2006) (quoting *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 81 (2d Cir.1980)). Furthermore, "New York courts are particularly disinclined to entertain claims of justifiable reliance" when "sophisticated businessmen engaged in major transactions ... fail to take advantage of" "access to critical information." *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.,* 748 F.2d 729, 737 (2d Cir.1984) (citing *Marine Midland Bank v. Palm Beach Moorings, Inc.,* 61 A.D.2d 927, 928, 403 N.Y.S.2d 15, 17 (1st Dep't 1978)). Nevertheless, whether a plaintiff was "placed on guard" of a fraud or took reasonable advantage of access to information is an "always nettlesome," "fact-intensive" question. *Schlaifer Nance & Co. v. Estate of Warhol,* 119 F.3d 91, 98 (2d Cir.1997). Reasonableness is normally "not to be decided on a motion to dismiss," *Barron Partners, LP v. Lab123, Inc.,* No. 07–cv–11135 (JSR), 2008 WL 2902187 at n. 3, 2008 U.S. Dist. LEXIS 56899 at n. 3 (S.D.N.Y. July 25, 2008), because a plaintiff must only plead facts sufficient to "render the claim" of reasonableness "plausible." *Thomas H. Lee Equity Fund V, L.P. v. Grant Thornton LLP,* 586 F.Supp.2d 119, 135 (S.D.N.Y.2008) (quoting *Iqbal v. Hasty,* 490 F.3d 143, 158 (2d Cir.2007)).

Here, defendants emphasize that Aarrowcast bargained for and received access to key Aarrowcast personnel and records before the closing. Yet on the pleaded record, it is "far from clear ... whether plaintiff[ ] had access to the 'critical information.'" *Thomas H. Lee Equity Fund V,* 586 F.Supp.2d at 135 (S.D.N.Y.2008) (quoting *Schlaifer Nance,* 119 F.3d at 98). It is not evident from the pleadings that Aarrowcast executives were forthright with IOP, and it appears that Aarrowcast's internal discussions regarding CNH took place through means that due diligence might not uncover: through in-person meetings, on the telephone, or (minimally) in stray emails with unexceptional subject lines such as "Karevich" and "9:30AM small group meeting."

 As for IOP's meeting with CNH, it is fairly hard to imagine how IOP could not have discovered CNH's renegotiation

request at its meeting with CNH the week before IOP bought Aarrowcast. A diligence meeting is not a kaffeeklatsch, but a precious opportunity for investment professionals to examine the merits of a contemplated transaction. If, in fact, IOP failed to ask useful questions at its meeting with CNH, then IOP is unlikely to survive summary judgment or to prevail at trial. From the pleadings, however, it is plausible that IOP asked reasonable questions and received misleading answers. In particular, Karevich's email asking to discuss CNH's contract with Armor away from IOP suggests that Karevich, for whatever reason, may have presented an unduly optimistic view of CNH's relationship with Aarrowcast.

### 2. *Disclaimers*

Defendants also suggest that explicit language in the Stock Purchase Agreement forecloses IOP from pleading reliance. For example, IOP represented that it did "not rely[ ] ... upon any advice, counsel or representations (whether written or oral) of Sellers or the Company, other than the express representations and warranties *made by Sellers* in this Agreement." SPA § 5.7(a)(ii) (emphasis added); *see also* § 3.28 ("Except as expressly set forth ... Sellers make no representation...."); § 5.10 ("none of Sellers ... has made any representation ... except as expressly set forth").

Of course, the Article III representations are "expressly set forth" in the Agreement, so reliance is not barred on the basis that those representations lie outside the contract. According to defendants, however, IOP disclaimed reliance on any representations that were not "made by Sellers." Thus, according to defen-

dants, IOP disclaimed reliance on the Article III representations, which Article III's preamble explicitly attributed to Aarrowcast.

There are at least four difficulties with defendants' reading.

First, defendants' reading loses sight of the primary purpose of section 5.7, which was to disclaim reliance on extra-contractual representations or advice. Aside from the two words that defendants focus on ("by Sellers"), nothing about section 5.7 suggests that section 5.7 was meant to distinguish among provisions *within* the Stock Purchase Agreement.

Second, the point of a representation is to induce reliance, and every private cause of action that springs from a misrepresentation (as opposed to a breach of warranty) requires reliance as an element. Thus, defendants' reading of the disclaimer in section 5.7(a), by eliminating any reliance on Article III, would turn the statements in Article III solely into warranties, in conflict with the preamble's indication that the statements in Article III are both representations and warranties.

Third, Article III contained *all* of the representations having to do with the condition of Aarrowcast's business. While the representations of Article IV are not unimportant,[21] it is inconsistent with our sense of commercial practice to think that IOP would enter into a multi-million-dollar transaction without relying on *any* representations concerning the object of its purchase.

Fourth, section 10.2(a) clearly refers to the Article III representations and warranties using the same "of ... Sellers" language as section 5.7(a). The first several lines of section 10.2(a) provide that the

---

**21.** These representations have to do with matters such as each Seller's corporate organization, each Seller's authority to sell its shares, and the absence of liens on each Seller's shares.

Sellers' indemnification provisions are triggered only "in the event of any breach or inaccuracy of the representations and warranties ... of ... Sellers." However, a later passage of section 10.2(a) distinguishes between the sellers' liability with respect to "representations and warranties set forth in Article IV" and Sellers' liability with respect to "all other representations and warranties" (namely, the representations and warranties of Article III).[22] If the words "representations and warranties of Sellers" were sufficient to exclude the Article III representations, then it would be unnecessary for section 10.2(a) to describe the sellers' liability with respect to those representations.

To be sure, if section 5.7 were completely unambiguous, we would have to accept defendants' reading despite its textual and structural difficulties. *See Greenfield v. Philles Records, Inc.,* 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 780 N.E.2d 166, 170 (2002). However, the text of section 5.7 may be susceptible to alternative readings that avoid these problems, and it is possible that further textual analysis or parol evidence will shed light on this question at summary judgment or at trial.

■ Thus, further development of the record is required before we can conclude with the requisite degree of certainty that, at the end of arms'-length negotiations, a sophisticated party would disclaim reliance on every single representation bearing on the economics of this transaction.[23]

For all these reasons, we do not dismiss IOP's non-contract claims for failure to plead reasonable reliance. Even so, we emphasize once again that, at summary judgment or at trial, IOP will need to produce (1) evidence that it exercised reasonable diligence, particularly at its meeting with representatives of CNH, and (2) evidence or argument to support an alternative reading of section 5.7.

### F. Fraud Claims on a Contract

Defendants next argue that IOP's common law fraud claim is "duplicative" of its contract claim, and thus barred.

■ Under New York law, a claim of fraud arising from the breach of a contract is not legally sufficient unless the plaintiff can "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are ... unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Cred. Servs., Inc.,* 98 F.3d 13, 20 (2d Cir.1996); *see MTA v. Triumph Advertising Prods., Inc.,* 116 A.D.2d 526, 527, 497 N.Y.S.2d 673, 675 (1st Dep't 1986) ("[A] cause of action for fraud does not arise when the only alleged fraud relates to a breach of contract."). IOP relies on the latter two prongs.

■ An alleged misrepresentation is "collateral or extraneous" to a contract if it is a " 'representation of present fact, not of future intent[,]' ... which was the induce-

---

22. "[O]ther representations" must mean representations from Article III. Within the Stock Purchase Agreement, only Articles III and IV contain any representations in IOP's favor, and IOP disclaimed reliance on any representations outside the Stock Purchase Agreement.

23. We note in passing that, if section 5.7(a) truly is a disclaimer of reliance on all repre-

sentations related to the subject of this transaction, then section 5.7(a) approaches an unlawful waiver of compliance with federal securities laws. *See* Exchange Act § 29(a) (codified at 15 U.S.C. § 78cc(a)); *cf. Harsco Corp. v. Segui,* 91 F.3d 337, 344 (2d Cir.1996) (suggesting that a disclaimer of all representations except "one vague seller's representation" would violate section 29(a)).

ment for the contract." *Deerfield Commc'ns Corp. v. Chesebrough–Ponds, Inc.*, 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 502 N.E.2d 1003, 1004 (1986) (memorandum) (quoting *Citibank, N.A. v. Plapinger*, 66 N.Y.2d 90, 94, 495 N.Y.S.2d 309, 485 N.E.2d 974, 976 (1985)); *see also Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 184 (2d Cir.2007); *TIAA Global Invs., LLC v. One Astoria Square LLC*, 127 A.D.3d 75, 87–89, 7 N.Y.S.3d 1, 10–11, 2015 N.Y. Slip Op. 1768 at *7 (1st Dep't 2015). "That the alleged misrepresentations would represent, if proven, a breach of the contractual warranties as well does not alter the result." *Merrill Lynch*, 500 F.3d at 184; *see also* 60A N.Y. Jur.2d § 233 ("[F]raud in the inducement of a written contract is not merged therein so as to preclude an action for fraud.").

▮ Here, the relevant representations did not pertain to defendants' ability or intention to perform the contract. (Indeed, it is undisputed that the sellers completely performed the contract by, among other things, conveying shares of Aarrowcast to IOP.) Instead, the contract made representations about the then-present quality of Aarrowcast's business in order to induce IOP to purchase Aarrowcast shares.

▮ Furthermore, a portion of IOP's alleged damages are "special damages." Special damages are specific monetary consequential damages, or "out-of-pocket pecuniary losses as a result of reliance on the alleged misrepresentation." *Landgarten v. Noise Cancellation Techs.*, No. 92–cv–6871 (LJF), 1993 WL 312999, 1993 U.S. Dist. LEXIS 11088 (S.D.N.Y. Aug. 11, 1993). Contrary to IOP's view, these do not include punitive damages, even though punitive damages are normally unavailable in contract. *See Koch Indus., Inc. v. Hoechst AG*, 727 F.Supp.2d 199, 214 n. 20 (S.D.N.Y.2010). However, IOP's brief indicates that the complaint's demand for compensatory damages includes consequential damages for costs that IOP incurred to rectify IOP's breaches of certain covenants with its own lenders. These consequential damages qualify as "special," and therefore IOP's common law fraud claim may stand with respect to these damages independently of whether the misrepresentations were collateral to the contract.

▮ IOP also alleges fraud as a basis to rescind the Stock Purchase Agreement. Rescission is an appropriate remedy for fraudulent misrepresentations, and not duplicative of a contract claim because it seeks to undo the contract itself.

### G. Diligence in Pursuing Rescission

Defendants finally argue that IOP forfeited its rescission claim by waiting too long to raise the claim after noticing the alleged misrepresentations. Although IOP had notice of possible misrepresentations almost immediately after closing, IOP is correct that the issue of diligence should be decided at summary judgment or at trial, and defendants have not cited any cases resolving this question on a Rule 12(b)(6) motion. *Cf. Shappirio v. Goldberg*, 192 U.S. 232, 24 S.Ct. 259, 48 L.Ed. 419 (1904) (case cited by defendants in which Court affirmed the dismissal of a bill in equity following evidentiary hearings in the trial court); *Ballow Brasted O'Brien & Rusin P.C. v. Logan*, 435 F.3d 235, 239 (2d Cir.2006) (case cited by defendants in which Circuit affirmed summary judgment).

### CONCLUSION

For the aforementioned reasons, the motion to dismiss is granted in part and denied in part. It is hereby

- **ORDERED** that all claims are dismissed insofar as they are grounded in the representations and warranties of sections 3.6(a) and 3.11(b) of the Stock Purchase Agreement; and it is further
- **ORDERED** that claims two (federal securities fraud on a theory of Holdings' primary liability), three (federal securities fraud on a theory of control-person liability) and four (common law fraud) are dismissed insofar as they relate to Aarrowcast's internal projections of sales to companies other than CNH.

The surviving claims are:

- claim one (indemnification for breach of warranty), insofar as it is grounded in the warranties of sections 3.5(b) and 3.19 of the Stock Purchase Agreement; and

- claims two (federal securities fraud on a theory of Holdings' primary liability), three (federal securities fraud on a theory of control-person liability), and four (common law fraud), insofar as they relate to CNH and are grounded in sections 3.5(b) and 3.19.

The parties shall confer and propose a discovery schedule.

**IT IS SO ORDERED.**